THE UNITED STATES, PLAINTIFF IN ERROR, *vs.* JACOB KNIGHT, BENJAMIN KNIGHT, ISAAC KNIGHT, AND EDWARD KNIGHT, DEFENDANTS IN ERROR.

Action on a bond given to the United States for the liberty of the jail yard in Portland, in the state of Maine. The condition of the bond was, that J. K. and B. K. "should continue true prisoners in the custody of the jailer, within the limits of the jail yard." It was agreed by the counsel for the plaintiff and defendants, that J. K. and B. K. had remained within "the limits of the jail yard," as established under the laws of 1787, of Massachusetts, then prevailing in Maine; the limits of the jail yard having in October, 1798, been extended over the whole county; but had not remained within the limits established on the 29th May, 1787, and existing when the act of Congress was passed, 4th January, 1800, authorizing persons under process from the United States to have "the jail limits," as established by the laws of the state. Held, that the act of Congress of 19th May, 1828, gives the debtors imprisoned under executions from the Courts of the United States, at the suit of the United States, the privilege of jail limits in the several states, as they were fixed by the laws of the several states at the date of that act.

Whatever might be the liability of the officer who took the bond from the defendants; if the jail limits continued to be such as were established under the law of Massachusetts of 1787; the bond not having been taken under that law, and the condition being different from the requirements of those regulations; the parties to the bond, the suit being upon the bond, are bound for nothing whatsoever, but what is contained in the condition; whether it be or be not conformable with the law.

The statute of May 19th, 1828, entitled, "An Act further to regulate Processes in the Courts of the United States," which proposes only to regulate the mode of proceeding in civil suits, does not divest the public of any right, does not violate any principle of public policy, but on the contrary makes provision, in accordance with the policy which the government has indicated, by many acts of previous legislation, to conform to state laws, in giving to persons imprisoned under their execution the privilege of jail limits, embracing executions at the suit of the United States.

The cases Wayman *vs.* Southard, 1 Wheat. 10; and Beers *vs.* Houghton, 9 Peters, 332, cited, and affirmed.

IN error to the Circuit Court of the United States for the District of Maine.

The United States, in 1838, instituted an action of debt against the defendants in error, on a bond executed by them on the 30th day of January, 1838, for the sum of seventeen thousand four hundred and ninety-four dollars and four cents; the condition of which was as follows:

"The condition of the above written obligation is such, that whereas the said Jacob and Benjamin Knight have been and now are imprisoned in the prison at Portland, in the said Maine district, by virtue of an execution issued against them on a judgment obtained against them by the said United States, at the District Court of the United States for Maine district, which was begun and holden at Portland, within and for the district of Maine, on the first Tuesday of December, A. D. 1837, for the sum of eight thousand four hundred and sixty-two dollars and thirty-six cents, principal, and one hundred and sixty-one dollars and seventy-nine cents for interest thereon, to

VOL. XIV.—2 C

the 19th day of December, aforesaid, and costs of suit taxed at twenty-four dollars and forty-seven cents, and also for all legal interest that may accrue on said sum of eight thousand four hundred and sixty-two dollars and thirty-six cents, from the said 19th December, until said judgment shall be fully discharged and satisfied, with one hundred cents more, for one writ of execution, and the officer's fees and charges for commitment, taxed at ninety-seven dollars and forty cents.

"Now, if the said Jacob Knight, and Benjamin Knight, from the time of executing this bond, shall continue true prisoners, in the custody of the jailer, within the limits of the jail yard, until they shall be lawfully discharged, and shall not depart without the exterior bounds of said jail yard, until lawfully discharged from said imprisonment, according to the laws of the United States in such cases made and provided, and commit no manner of escape, then the said obligation to be void; otherwise to remain in full force."

In this case the parties in the Circuit Court agreed to the following statement of facts: "On the 30th day of January, last past, Jacob and Benjamin Knight were committed to the jail in the city of Portland, on an execution issued on a judgment in favour of the said United States, against said Jacob and Benjamin; whereupon the said Jacob and Benjamin, as principals, and Isaac and Edward Knight as sureties, gave the bond declared on in this suit; that said Jacob and Benjamin continued to remain within the limits of the town of Portland, exclusive of the islands, and did not depart therefrom up to the time of the commencement of this suit, nor have they since departed therefrom; but neither the said Jacob nor Benjamin, from the time of the execution of said bond, nor afterwards, at any time, lodged in the night time within the walls of said jail, but remained at large within the limits of said town of Portland, exclusive of the islands belonging to the same, both day and night.

"If, upon the foregoing facts, the Court are of opinion that the condition of said bond has been broken by the said Jacob and Benjamin, and that they have made an escape, then the Court are to render judgment, to be entered as of said October term, and as on verdict rendered for the said United States; and if the Court shall be of opinion that the obligation of the bond has not been broken, then judgment to be rendered, in manner aforesaid, for the said defendants."

And each party reserves to themselves the right to a writ of error, to reverse any such judgment, as may, as aforesaid, be rendered by said Court in the case.

The justices of the peace of the county of Cumberland, on the 29th May, 1787, established the "proper boundaries of the jail yard in the county, to be: beginning at the bottom of Love lane, at low-water mark; thence up said lane, including the houses on each side thereof to the northerly side of Back street; thence down said Back street, including the houses on both sides thereof, to King street; from thence down said King street, including the houses on both sides

thereof, to low-water mark; thence by low-water mark to the first bounds, including all the ground and buildings within the aforesaid limits."

Afterwards, on the 16th of October, 1798, the limits of the jail yard were extended to "the town of Portland, exclusive of the islands:" and on the 10th of September, the judges of the Court of Sessions ordered, "that the bounds of the jail yard be extended over the whole county, and to the exterior limits thereof: which are hereby fixed and established as the bounds of the jail yard for the said county of Cumberland."

At the October sessions of the Circuit Court, judgment, on the facts agreed, was given, that "the obligation of the bond was not broken;" and the United States prosecuted this writ of error.

The case was argued by Mr. Gilpin, Attorney General of the United States, for the plaintiff in error; and by Mr. Evans, for the defendants.

Mr. Gilpin, for the United States, submitted to the Court that the obligation of the bond given by the defendants to the United States was broken:

1. Because they were only entitled, pursuant to the act of Congress of 6th January, 1800, to the like privileges of the yards or limits of the said jail, as persons confined on process from the Courts of Maine were entitled to at the time that act was passed. 1 Story's Laws U. S. 715.

2. Because the privileges of persons confined on process from the Courts of Maine at the time that act was passed, did not extend to the privilege of being outside of the walls of the jail during the night time.

Mr. Gilpin continued:

The conditions of the bond which the defendants gave to the United States were: 1. That Jacob and Benjamin Knight should continue true prisoners in the custody of the jailor, within the limits of the jail yard, until they should be lawfully discharged. 2. That they should not depart without the exterior limits of the jail yard, until lawfully discharged from imprisonment according to the laws of the United States: and, 3. That they should commit no manner of escape. A violation of either of these conditions, by Jacob or Benjamin Knight, entitled the United States to a judgment for the penalty of the bond. The facts are, that although neither of them did depart beyond the limits of the town of Portland exclusive of the islands, which constituted the boundaries of the jail yard, yet neither of them did at any time lodge at night within the walls of the jail, but both went at large within the boundaries during the night as well as the day. The Circuit Court adjudged that this was no breach of either of the conditions of the bond.

The correctness of this judgment depends upon the meaning of

"true imprisonment," and an "escape" therefrom. A true imprisonment, under an execution from the Courts of the United States, is that which the laws of the United States prescribe, and an act of the prisoner, before his discharge, at variance therewith, is an escape. The United States, not having jails in the states for the custody of their prisoners, recommended to the state legislatures, on the 23d September, 1789, (1 Story's Laws, 70,) to make it "the duty of the keepers of their jails, to receive and safe keep therein, all prisoners committed under the authority of the United States," until lawfully discharged; and to subject them to the same penalties as in the case of prisoners committed under the state laws. To this recommendation Massachusetts, of which Maine then constituted a part, acceded on the 26th February, 1790, (1 Laws of Massachusetts, 487;) thus requiring all prisoners committed under the laws of the United States, to be "received and safely kept" in the jails of Massachusetts. On the 5th May, 1792, (1 Story's Laws, 246,) Congress extended, for a limited period, to persons so imprisoned, "like privileges of the yards or limits of the jails," as persons confined for debt under judgments of the state Courts; but subject also to "the like regulations and restrictions." These privileges they renewed, also for limited periods, in 1794 and 1796, (1 Story's Laws, 340. 441;) and finally made them permanent by the act of 6th January, 1800. 1 Story's Laws, 715. Since then, and previous to the present suit, they have passed no additional act upon the subject. The law, therefore, in regard to the imprisonment of debtors of the United States is, that they are to have the same privileges, and be subject to the same restrictions, while in jail, as debtors under process from the state Courts had or were subject to, on the 6th January, 1800; that then, and only then, are they "truly imprisoned;" and that the jailor is subject to the penalties attendant on their "escape," if he allows them any other privileges, or relaxes any of those restrictions.

What, then, were the privileges and restrictions of an imprisoned debtor in Massachusetts in 1800? They were, as declared in the act of 21st February, 1785, (1 Laws of Massachusetts, 221,) that he might have "a chamber and lodging in any of the houses or apartments belonging to the prison, and liberty of the yard within the day time." These were the privileges of the debtors; and the restrictions upon them: to lodge in any apartment belonging to the jail, and to be at large within the limits of the yard in the day time. To lodge elsewhere, or to be set at large even within the limits of the yard during the night, was not a "true imprisonment;" but clearly amounted to "an escape." The words of the law seem too plain to permit a doubt as to this construction; but if there be any, it is removed by the judicial decisions of the Courts of Massachusetts. The rule laid down in the case of M'Keen *vs.* Delancey, 5 Cranch, 32, that the construction given by the State Courts to state statutes is to be adopted, has been always upheld by this Court. Applied to the present case, it is conclusive. A series of decisions

upon this statute has established, as an absolute restriction on the privileges of an imprisoned debtor, that he must lodge in an apartment belong to the jail; and that he must not be absent from such lodging, or outside of the jail, at night; it has established, that a violation of this restriction is "an escape." Bartlett vs. Willis, 3 Mass. Rep. 105. Clapp vs. Cofran, 17 Mass. Rep. 101. Freeman vs. Davis, 7 Mass. Rep. 201. Burroughs vs. Lowder, 8 Mass. Rep. 379. Trull vs. Wilson, 9 Mass. Rep. 154.

It is thus apparent, that under the laws of Massachusetts an imprisoned debtor who should lodge outside of the jail, or be absent therefrom at night, would not " remain a true prisoner," but would " commit an escape:" and as the acts of Congress of 1789 and 1800, while they extend the same privileges, also impose the same restrictions on debtors imprisoned on process from the Courts of the United States; it follows that Jacob and Benjamin Knight did not " remain true prisoners," but that their acts amount to the commission of " an escape." Consequently, the condition of the bond of the defendants has been broken, and the judgment of the Court below is erroneous.

Mr. Evans, for the defendants in error, contended that the condition of the bond in suit had not been broken:

" 1. Because the act of Congress of 6th January, 1800, gives to persons imprisoned on execution, at the suit of the United States, the same privileges and liberty of jail limits as the laws of the states, at the time of such imprisonment, allow to persons confined on processes issuing from the state Courts; and by the laws of Maine, in force at the date of the bond in suit, it was not required of persons entitled to the jail limits, to remain within the walls of the jail in the night time.

" 2. Because, by the act of Congress of 1828, ch. 68, the same proceedings on writs of execution, issuing from Courts of the United States, are required, as were then used in the state Courts: and by the laws of Maine, then in force, proceedings on processes issuing from the state Courts, did not require debtors, who were entitled to the jail limits, to remain within the walls of the prison at night.

" The bond was given stipulating that the debtors to the United States, Jacob Knight and Benjamin Knight, should continue within the limits of the jail yard until they should be lawfully discharged: and the agreed facts state, that "they continued to remain within the limits of the town of Portland, exclusive of the islands, and did not depart therefrom, up to the time of the commencement of the suit."

It is said, that they had not continued within " the limits" which were established when Congress passed the act of 23d September, 1789, those limits having been established under the laws of Massachusetts, prevailing in Maine, authorizing the use of her jails by the United States, on the 27th of May, 1787. It is admitted, the defendants continued, from the time of the execution of the bond,

within the jail limits established under the laws of Maine, before the bond was given, and in force up to the period at which this suit was instituted.

What laws relative to jail limits are in force in the state of Maine? The United States do not deny, that if the laws now in force apply to the case of the defendants, they are not liable on the bond.

When the state of Maine came into the Union, all the laws of Massachusetts, which had before been in force, were repealed. The act of the legislature of Massachusetts, authorizing the use of her jails by the United States, of 26th February, 1790, did not exist. No laws but those of Maine, since she became a state, give to the United States the right to confine her debtors in the jails of that state. Such persons can only be confined in the jails of Maine, according to the laws of Maine.

It is submitted to the Court, that the acts of Congress of 23d September, 1789, (1 Story's Laws of the United States, 70;) of 5th May, 1792, (2 Story's Laws, 246,) and the acts of 1794, 1796, and 1800, adopted, prospectively, the legislation of the states as they might from time to time regulate the jail yards. This is the plain stipulation of the laws. The legislatures of the states stood on a kind of contract. If you will grant to the United States the use of your jails, persons who may be confined at the instance of the United States shall be subject to the regulations of the states.

The construction of the acts of Congress which is claimed by the United States, would place citizens of the United States, when sued in the state Courts, in a different situation from that in which they would be when under execution by process from the Courts of the United States. This would produce discord and dissatisfaction; complaints would be justly urged against the laws of the United States as oppressive. The purpose of the law was to produce harmony. The fair and liberal construction of the legislation of Congress on this subject is, that persons confined at the suit of the United States, shall have the same regulations applied to them as are in force in relation to persons imprisoned under process from the Courts of the states of the Union.

The acts of Congress relating to process in the Courts of the United States, declare that the forms of process shall be the same as the forms "now" used in the states. Such has been the construction of the process acts. But in the act of 1789, relative to imprisonment, and in the subsequent acts of Congress, there is no such term as "now." The cases which have been cited by the Attorney General, as to the process acts, have, therefore, no application to the imprisonment acts.

It has been questioned whether Congress have the power, constitutionally, to adopt, prospectively, the legislation of states. This is no longer a question—so far as the action of Congress can give a construction to the Constitution—Congress have prospectively adopted the state practice in actions in the Circuit Courts.

In regulating the militia, Congress have adopted, prospectively, the state regulations, and have consented to the discipline of the militia being under and in conformity with state laws. Exemption from militia duty is determined by the state rules.

There is no case in which it has been decided that the powers of the legislation of the United States are not prospective. In the case of the United States *vs.* Noah, sheriff, &c., it was decided, that a "sheriff of a Court under the act of Congress of January 6th, 1800, is bound to take a bond for the limits as provided by the state laws, from a prisoner confined in process from the Courts of the United States; and false imprisonment would lie on his refusal." Paine's C. C. R. 368. It was also decided in the same case, that "process" in the act includes executions as well as mesne process: and that a bond for the limits, taken by the sheriff from a prisoner under process from the Courts of the United States, has in all respects the same incidents, and the like legal effect with a bond taken under the state laws.

The act of the legislature of New York, making it the duty of the sheriffs of counties to receive prisoners committed under process from the Courts of the United States, was passed in 1801, and this act gave the sheriffs of the state, authority to take bonds for the limits. The act of Congress authorizing the confinement of the prisoners under process of the United States, was passed on the 6th January, 1800. This case fully decides the adoption of the prospective or future legislation of the states, in such matters. This decision has never been questioned.

The bond sued upon in the case before the Court, was not taken under the Massachusetts law of 1789. The condition of the bond is that the persons shall continue true prisoners within the limits of the jail yard. What is the provision in the law of Massachusetts? Not that prisoners should have liberty of the jail yard within the prison. The law of 1789 was, that the person should continue within the limits of the prison. This is not the jail yard. This will be found fully explained in 3 Mass. Rep. 98.

The construction which the Court will give to this bond will be strict. The action is against the sureties, and they are entitled to all the benefits of such a construction. Cited 9 Wheat. 680.

The act of Congress of 19th May, 1828, ch. 68, provides, that writs of execution and proceedings shall be such as the laws of the state shall determine. Proceedings are to be according to the provisions of the state laws. It has been decided in Beers *vs.* Houghton, 9 Peters, 329, that proceedings comprehend all the acts after execution. In that case a discharge by the state law of Ohio discharged the bail.

If the interpretation of "proceedings" is not such as is contended for, no power exists to extend the privileges of the jail limits as regulated by the state laws. If the acts of Congress on this subject are not prospective in the new states, no authority of this kind exists.

It is submitted, that the act of Congress of 1828, extends to all

[The United States *vs.* Knight.]

suits by the United States. The provision is as to all process issuing from the Courts of the United States; no distinction exists as to suits by the United States.

There was a case decided in Massachusetts, where a party confined at the suit of the United States; had the benefit of the poor debtor's act; an act passed after the act of 1789.

Mr. Gilpin, Attorney General, in reply,

The positions attempted to be established on the part of the plaintiffs in error, were these: that if Jacob and Benjamin Knight had not "remained true prisoners," or had committed what amounted to "an escape," in contemplation of the laws of the United States, the condition of the bond was broken, and the judgment of the Circuit Court was erroneous; that the law of the United States ascertaining these points, was the act of 6th January, 1800, (1 Story's Laws, 715,) which gave the privileges and adopted the restrictions in regard to imprisoned debtors, which then existed under the state laws; and that these state laws made it "an escape," if the debtor lodged at night elsewhere than in an apartment belonging to the jail, or had remained outside of the jail at night; which it was admitted Jacob and Benjamin Knight had done.

It is contended on the part of the defendants in error, that even if the acts of Jacob and Benjamin Knight, did amount to an escape under the state laws thus relied on, yet that the bond now sued upon, was not taken in conformity with those laws; that its condition, instead of being in the words of the statute of Massachusetts, is simply that the parties shall not depart without the exterior bounds of the jail yard, which they have not done; and that, therefore, the condition has not been broken, though they were not within the prison walls at night. To this it is replied, that, even supposing the words of the statute not to have been sufficiently followed, in setting forth, in the bond, the particular condition referred to, yet this objection is met by the last clause, which provides in general terms, that the parties shall "commit no manner of escape." The acts of the parties do clearly constitute "an escape" under the statute in question, and amount to a breach of that condition, so as to render them liable to the penalty, even if they were not so in regard to the other conditions.

It is also contended, that even if the privileges of an imprisoned debtor depend on the act of 6th January, 1800, yet that the construction which limits them to such as were allowed by the state laws, in force at that time, is incorrect. To this it is replied, that the words of the act distinctly adopt the regulations of the states existing at the time of its passage, and no others; that it could never be the intention of Congress, if it were within their constitutional power, to sanction prospective legislation over which they exercised no control; and that, by repeated decisions of this Court, it has been held that in adopting state laws of this character, those only are included which are actually in existence at the time. Way-

man vs. Southard, 10 Wheat. 41. United States Bank vs. Halstead, 10 Wheat. 59. Beers vs. Houghton, 9 Peters, 361. Wilcox vs. Hunt, 13 Peters, 378. Anonymous, Peters' C. C. Rep. 1.

But the principal ground taken on behalf of the defendants in error is, that the privileges of imprisoned debtors, at the time this suit was brought, did not depend on the act of Congress of 6th January, 1800, but on the act of 19th May, 1828; (4 Story's Laws, 2221,) which declared that " writs of execution and other final process in the Courts of the United States, and the proceedings thereon, should be the same as were then used in the state Courts." To this it is answered, that the act referred to does not apply to suits in which the United States are plaintiffs; and that if it did, the "proceedings" therein mentioned do not embrace the privileges of the jail limits, as then used in the states.

It is a settled rule, that in general statutes which regulate the recovery of debts, the government is not bound unless they are made applicable to it in express terms, or by necessary implication. This is no invidious prerogative right, but a rule founded on well ascertained public policy, necessary to protect the public interests against the negligence of public officers; and specially to guard the public revenue. It is a rule adopted in many if not all the states of this Union, and probably in most other countries, as well as in the United States; and it has been sanctioned by repeated judicial decisions. United States vs. Wilson, 8 Wheat. 256. United States vs. Hoare, 2 Mason, 314. United States vs. Greene, 4 Mason, 433. United States vs. Hewes, (lately decided by Judge Hopkinson in the District Court of Pennsylvania.) Staughton vs. Baker, 4 Mass. Rep. 528. People vs. Rossiter, 4 Cowen, 143. Corn vs. Baldwin, 1 Watts, 54. King vs. Allen, 15 East, 340.

The act of 19th May, 1828, is certainly not applicable, by its terms, to suits to which the United States are parties; and the whole course of legislation by Congress, in regard to public debtors, refutes any implication that they could intend so to apply it. They have from the earliest period specially legislated in regard to the debtors of the United States, and the remedies against them; although general laws, independent of these, were at the same time in existence and full force, to regulate the proceedings in all suits between individuals. They adopted their own system in regard to their own debtors; they have from time to time altered and amended that system, without reference to private suits. On the same day, the 6th June, 1798, we find two acts of Congress passed " for the relief of persons imprisoned for debt;" the one applicable to private suits, the other to those brought by the United States. 1 Story's Laws, 506. By the act of 2d March, 1799, (1 Story's Laws, 630,) special and exclusive privileges are given for recovering the amount of unpaid revenue bonds, in suits brought by the United States. On the 6th January, 1800, the general provisions of an act for relieving imprisoned debtors, are made applicable to those " imprisoned at the suit of the United States," by express terms. 1 Story's Laws, 715. On the

3d March, 1817, we have an act of a similar character, limited by its terms to persons indebted to the United States.   3 Story's Laws, 1652.   On the 15th May, 1820, on the 3d March, 1825, and on the 2d March, 1831, (3 Story's Laws, 1791, 1997; 4 Story's Laws, 2236,) we find acts of Congress legislating specially in regard to public debtors; which show conclusively that they were not embraced within the general provisions for the recovery of debts due from one individual to another.   It has been clearly the intention of Congress to keep under their own control the course of proceeding against public debtors; they never intended to blend this with the general regulations they might establish in regard to private suits; much less can it be conceived that they intended that persons indebted, or in default to the treasury of the United States; in relation to whom they had passed so many special laws; should be entitled to every privilege which the laws of each different state might deem it just to extend to a private and individual debtor.

Supposing, however, that the act of 19th May, 1828, is to be construed as embracing, by implication, suits in which the United States are plaintiffs; yet it is submitted that the privileges of the jail limits, which are given to an imprisoned debtor, are not "proceedings on a writ of execution or other final process," within the meaning of that act.

The language of the act itself is clear.   It is confined to "proceedings on an execution."   The privileges of the jail limits, are in no sense such.   Proceedings on an execution are something done by virtue thereof; something which the writ has directed to be done; something that "proceeds" between the time that the writ issues and is returned.   The term, says Chief Justice Marshall, "denotes progressive action;" it relates "to the conduct of the officer while in possession of the execution;" it "prescribes his conduct in executing the process."   Wayman *vs.* Southard, 10 Wheat. 28. 31, 32. "The form of the writ," says Judge Thompson, "contains, substantially, what is to be done under it;" it is the "duty of the officer to execute the process according to its commands."   United States Bank *vs.* Halstead, 10 Wheat. 57. 64.   These proceedings include, in the language of Judge Story, "the conduct of the officer in the service of the process, and the exemption of the defendant from arrest."   Beers *vs.* Houghton, 9 Peters, 362. 368.   Such, clearly, is the meaning of "proceedings on an execution;" obedience to the commands of the writ; progressive acts done by the officer of the Court in pursuance of its requirement; his return that he has done so: these are the proceedings on the writ, and they are complete when the marshal has so returned it; the writ itself has then become a part of the records of the Court, and no further proceeding on it can take place. The defendants have been committed, as the writ directed; the privileges to which they may be entitled are independent of that process; they form no part of the conduct of the marshal; he has nothing to do with them: how then can they be regarded as a portion of his proceedings?

[The United States *vs.* Knight.]

Such, too, appears to be the evident meaning of the acts of Congress, or there has been a system of parallel legislation equally inadvertent and unnecessary. The object of the act of the 19th May, 1828, is, by its title, " to regulate processes;" and it relates to the " proceedings on final process." Now if these words include within them the privileges of jail limits given by the state laws to an imprisoned debtor, then were the acts of Congress of 30th May, 1794, (1 Story's Laws, 340,) of 28th May, 1796, (1 Story's Laws, 441,) and of 6th January, 1800, (1 Story's Laws, 715,) totally useless; since at the time each of these laws was passed, the former act " to regulate processes," passed on the 8th May, 1792, (1 Story's Laws, 257,) was in full force; and embraced the " proceedings on final process," in language even more full than that of the act of 19th May, 1828. Is it conceivable that if Congress considered the words of the act of 8th May, 1792, which direct that " the modes of proceeding in suits shall be the same as were then used in the state Courts," as embracing the privileges of the jail limits, to which a debtor was entitled by the state laws; they would have passed the acts of 1794, 1796, and 1800, for the express purpose of conferring those privileges? Again: the titles of the acts show conclusively that their objects were different. The acts of 8th May, 1792, and 19th May, 1828, are stated to be acts for the regulation of processes; those of 1794, 1796, and 1800, are stated to be for the relief of imprisoned debtors, and they clearly arise out of the resolution of Congress, of 23d September, 1789, (1 Story's Laws, 70,) which placed the prisoners of the United States in state jails; and were intended to put them on the same footing, with respect to the mode of imprisonment, as other debtors then were.

The same distinction may, it is thought, be traced in the decisions of this Court upon the language of these acts. When its opinions are attentively examined, it will not be found that it has ever considered the privileges of the jail limits, given by the act of 6th January, 1800, as embraced in the process acts. In the case of Randolph *vs.* Donaldson, 9 Cranch, 85, the custody of a prisoner, after his commitment, was held to be a matter with which the marshal had nothing to do; although the act of 24th September, 1739, directs that officer to execute all process, and consequently devolves upon him every act which can be regarded as a proceeding thereon. In the case of Wayman *vs.* Southard, 10 Wheaton, 20, the whole scope of the opinion refers to the conduct of the marshal while the writ is in his hands, as constituting his " proceedings on the execution." It speaks, in express terms, of the act of 1800, as that which authorizes the marshal to allow the benefit of prison rules, to those who are in custody under process issued from the Courts of the United States, in the same manner as to persons imprisoned under state process; it refers to the previous temporary laws having the same object in view; and it alludes, with evident doubt, to an argument deriving this authority from the process act. 10 Wheaton, 35. The facts of that case also show the nature of the proceedings; they were

the correctness of the marshal's mode of sale under a fieri facias; the correctness of the return made by him; the question whether or not he had obeyed the commands of the writ. In the case of the Bank of the United States vs. Halstead, 10 Wheaton, 54, a similar question was involved; it related to the propriety of the marshal's conduct, and whether or not he had proceeded correctly in his mode of executing the process. The case of Beers vs. Houghton, 9 Peters, 356, arose expressly on the mode of proceeding by the marshal under an execution. He was directed by the writ to arrest a person; he found him to be exempted by the state laws from arrest; his return to that effect was held to be proper; his proceedings were strictly proceedings on the execution; the person he was ordered to arrest was, in point of fact, legally discharged from custody, as completely as if he had paid the debt; and the marshal so made his return. As far as the proceeding on the execution was involved, it was in no respect similar to the privilege of the jail limits; the latter is a mere incident to the custody of the debtor, whether granted or not, the proceedings under the writ go on; it does appear upon the record; it does not affect in any way the discharge or satisfaction of the debt.

It thus appears, that whether we take the words and plain intent of the act of 19th May, 1828; or the general scope of legislation by Congress, in regard to processes, and to the imprisonment of debtors; or the course of judicial decision, as applied to the proceedings of a marshal in the execution of final process; the provisions of that act cannot be properly considered as embracing the privilege of jail limits, or as applicable to the present case. That case must depend on the provisions of the act of 6th January, 1800; which, by subjecting the defendants to the laws of Massachusetts, then in existence, deprives them of the privilege to which they would have been entitled, had they not failed to comply with the terms prescribed by that law, which are also the conditions mentioned in the bond.

Mr. Justice BARBOUR delivered the opinion of the Court.

This case came before us upon a writ of error to the Circuit Court of the United States, for the District of Maine.

It was an action brought upon a bond given to the United States, in the year 1838, for the liberties of the jail yard in Portland. The general issue was pleaded, with leave to give special matter in evidence. The condition of the bond, after reciting that Jacob Knight and Benjamin Knight have been, and now are, imprisoned in the prison at Portland, in Maine District, by virtue of an execution issued against them, on a judgment obtained against them by the United States, at the District Court of the United States, for the Maine District, &c., proceeds as follows: "Now if the said Jacob Knight and Benjamin Knight, from the time of executing this bond, shall continue true prisoners, in the custody of the jailor, within the limits of the jail yard, until they shall be lawfully discharged, and shall not depart without the exterior bounds of said jail yard until

lawfully discharged from said imprisonment, according to the laws of the United States, in such cases made and provided, and commit no manner of escape, then the said obligation to be void; otherwise, to remain in full force."

The parties agreed to a statement of facts, as follows: "On the 30th of January last past, the said Jacob and Benjamin were committed to the jail in the city of Portland, on an execution issued on a judgment in favour of the United States, against said Jacob and Benjamin: whereupon the said Jacob and Benjamin, as principals, and the said Isaac and Edward, as sureties, gave the bond declared on in this suit; that Jacob and Benjamin continued to remain within the limits of the town of Portland, exclusive of the islands, and did not depart therefrom, up to the time of the commencement of this suit, nor have they since departed therefrom; but neither the said Jacob nor Benjamin, from the time of the execution of said bond, nor afterwards at any time, lodged in the night time within the walls of said jail, but remained at large within the limits of said town of Portland, exclusive of the islands belonging to the same, both day and night."

Upon this agreed state of facts, the Court gave judgment for the defendants: to reverse which, this writ of error is brought.

It appears from the record, that at a Court of General Sessions of the Peace, for the county of Cumberland, within which Portland is situated, held in the year 1798, the limits of the town of Portland, exclusive of the islands, were fixed and determined, as the boundaries of said jail yard; and that the Court of Sessions at Portland, in the year 1822, extended the bounds of the jail yard over the whole county, and to the exterior limits thereof. It appears, also, from the facts agreed, that Jacob and Benjamin Knight continued to remain within the town of Portland, exclusive of the islands, without ever having departed therefrom; but that neither of them lodged in the night time within the walls of the jail, but went at large, both day and night, within the limits of the town of Portland, exclusive of the islands.

Upon this state of facts, it has been contended by the Attorney General, that the imprisoned debtors were guilty of an escape; because they were not within the walls of the jail in the night time; although they always continued both day and night, within the limits of the jail yard. It is said, that the only act of Congress in force, at the date of the bond in question, which entitled the parties to the privileges of jail yards when imprisoned on process issued from any Court of the United States, at the suit of the United States, was the act of the 4th January, 1800; which enacts, "that persons imprisoned on process issued from any Court of the United States, as well at the suit of the United States, as at the suit of any person or persons, in civil actions, shall be entitled to like privileges of the jails, or limits of the respective jails, as persons confined in like cases on process, from the Courts of the respective states are entitled to, and under the like regulations and restrictions." That

this act of Congress only adopted the state laws then in force; that by the law of Massachusetts (of which Maine was then a part,) then in force, as construed by her Courts, it was an escape for a debtor, having the liberty of the yard, to be without the walls of the prison in the night time; although he was within the limits of the yard. It is certainly true, that this Court has construed the acts of Congress adopting state laws in relation to writs and processes, and the proceedings thereon, as applying to the state laws then in force. 10 Wheat. 1. 51. 9 Peters, 331. It is also equally clear, that the construction of the laws of Massachusetts then in force, as to the debtor being without the walls of the prison during the night time being an escape, is such as has been stated; the decisions cited at the bar fully show it.

Whilst, however, we admit these premises, we cannot yield our assent to the conclusions drawn from them.

If it were even conceded that the act of Massachusetts of 1784 was in force at the date of the execution of the bond in question; although it would subject the officer to liability, yet it would not have affected these parties. From the language of that act, a person imprisoned for debt, was allowed to have a chamber and lodging in any of the houses, or apartments belonging to the prison, and liberty of the yard within the day time. It was the construction put on these words, which made it necessary for the debtor to be within the walls of the prison in the night time. In the bond in question, there is no such language. Whilst, therefore, the officer might have been liable, for taking from the debtor a bond, not in conformity with the statute, but extending to him a greater privilege than was allowed by law; yet in this case, the suit being on the bond, the parties are bound for nothing whatsoever, but what is contained in the condition of the bond, whether it be or be not conformable with the law. The condition of this bond is satisfied by the parties not departing without the exterior bounds of the jail yard, whether they are within the prison walls in the night time, or not: and it appears from the agreed case, that they did not depart without those bounds; there was then no breach of the condition of the bond.

But we now proceed to the consideration of another question of very great practical importance in the Courts of the United States; and that is, whether the act of 1828, May 19th, entitled an "act further to regulate processes, in the Courts of the United States," has not since its passage regulated the right of imprisoned debtors to the privilege of the jail liberties?

The third section of that act is in the following words: "And be it further enacted, that writs of execution and other final process, issued on judgments and decrees rendered in any of the Courts of the United States, and the proceedings thereupon, shall be the same, except their style, in each state, as are now used in the Courts of such state;" &c., with a proviso, "that it shall be in the power of the Courts, if they see fit, in their discretion, by rules of Court, so far

to alter final process in said Courts, as to conform the same to any change which may be adopted by the legislatures of the respective states, for the state Courts."

It is first objected, that whatsoever may be the construction of this section, as now governing executions in case of other parties, yet it does not embrace those issued on judgments rendered in favour of the United States; and this upon the ground that the United States are never to be considered as embraced in any statute, unless expressly named.

The words of this section being, "that writs of execution and other final process, issued on judgments and decrees rendered in any of the Courts of the United States;" it is obvious, that the language is sufficiently comprehensive to embrace them: unless they are to be excluded, by a construction founded upon the principle just stated. In Bacon's Abridgment, title Prerogative, 3—5, it is said, that the general rule is, that where an act of Parliament is made for the public good, the advancement of religion and justice, and to prevent injury and wrong, the king shall be bound by such act, though not particularly named therein. But where a statute is general, and thereby any prerogative, right, title, or interest, is divested, or taken from the king, in such case he shall not be bound; unless the statute is made by express words, to extend to him. It is a settled principle, that the king is not, ordinarily, barred, unless named by an act of limitations. The principle expressed in the maxim, nullum tempus occurrit regi, rests upon the ground, that no laches shall be imputed to him. The doctrine, that the government should not, unless named, be bound by an act of limitations, is in accordance with that just cited from Bacon, because if bound, it would be barred of a right; and, in all such cases, is not to be construed to be embraced unless named, or what would be equivalent, unless the language is such as to show clearly that such was the intent of the act. The same principle has been decided in New York, Massachusetts, Pennsylvania, and no doubt, in other states; and all upon the same ground. Not upon any notion of prerogative; for even in England, where the doctrine is stated under the head of prerogative, this, in effect, means nothing more than that this exception is made from the statute, for the public good; and the king represents the nation. The real ground is a great principle of public policy, which belongs alike to all governments, that the public interest should not be prejudiced by the negligence of public officers, to whose care they are confided. Without undertaking to lay down any general rule as applicable to cases of this kind, we feel satisfied, that when, as in this case, a statute which proposes only to regulate the mode of proceeding in suits, does not divest the public of any right, does not violate any principle of public policy; but on the contrary, makes provisions in accordance with the policy which the government has indicated by many acts of previous legislation, to conform to state laws, in giving to persons imprisoned under their execution, the privilege of jail limits; we shall best carry into

effect the legislative intent, by construing the executions at the suit of the United States, to be embraced within the act of 1828.

Having come to this conclusion, it only remains to inquire whether the words in the act of 1828, "the proceedings thereupon," (that is on executions,) embrace as a part of those proceedings, the rights of an imprisoned debtor to have the privilege of the jail limits? Upon this question, we are relieved from the necessity of argument, by the decisions of this Court.

In the case of Wayman *vs*. Southard, this Court was expounding the meaning of the words, "modes of proceeding," in the process act of 1792; and the question was, whether these words included "proceedings on executions." They decided, that they did; but the act of 1828, passed after the decision of the case of Wayman *vs*. Southard, adopted the very terms, "proceedings on executions," because the expression is, "proceedings thereupon," referring to executions, which had just preceded it. And the reasoning of the Court in Wayman *vs*. Southard, proves clearly, that these last words would include proceedings by debtors to obtain the privilege of the jail liberties. In the same case of Wayman *vs*. Southard, it was objected, that the process act of 1792 ought not to be construed as embracing the proceedings on executions, because if it did, it would furnish the rule as well for writs of capias ad satisfaciendum, as of fieri facias; and that the marshal would be as much bound to allow a prisoner the benefit of the rules under the act of Congress of 1800, as to sell upon the notice, and on the credit prescribed by the state laws; and that as the act of 1800 had, by separate and distinct legislation, provided for the jail limits, Congress could not be supposed to have provided for the same subjects in the process act. But the Court considered this separate provision as to the jail limits, merely as a cumulative act of legislation, with a view to remove doubts that might have arisen from the jails in which prisoners were confined not belonging to the United States. And this answers the argument urged at the bar, upon the ground of the several acts which especially provided for jail liberties, against the construction of the act of 1828, which would extend to embrace the privilege of jail liberties, within the terms, "proceedings thereupon," that is, on executions. In Beers et al. *vs*. Houghton, 9 Peters, 362, this Court in construing this very act of 1828, say, "the words, the proceedings on writs of execution, and other final process, must from their very import be construed to include all the laws, which regulate the rights, duties and conduct of officers, in the service of such process, according to the exigency, upon the person, or property of the execution debtor; and also, all the exemptions from arrest, or imprisonment under each process, created by those laws.

This quotation covers the whole ground of controversy, on the effect of these words, "proceedings thereupon." We are of opinion, therefore, that the act of 1828, gives to debtors imprisoned under executions, from the Courts of the United States at the suit of the

[The United States *vs.* Knight.]

United States, the privilege of the jail limits in the several states, as they were fixed by the laws of the several states at the date of that act.

We give no opinion, whether that act would extend so far as to enable the imprisoned debtors of the United States to avail themselves of the benefit of the insolvent laws of the states; as the question does not arise in this case.

Upon the whole view of the case, we think the judgment of the Circuit Court correct, and it is, therefore, affirmed.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Maine, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this Court, that the judgment of the said Circuit Court, in this cause be, and the same is hereby, affirmed.

2. D 2