**STATE OF RUSSIA v. BANKERS' TRUST CO. et al.**

District Court, S. D. New York.
Sept. 18, 1933.

Coudert Brothers, of New York City (Frederic R. Coudert and Mahlon B. Doing, both of New York City, of counsel), for plaintiff.

White & Case, of New York City (J. Du Pratt White and Joseph M. Hartfield, both of New York City, of counsel), for defendant Bankers' Trust Co.

Shearman & Sterling, of New York City (Philip A. Carroll and Otey McClellan, both of New York City, of counsel), for defendant National City Bank.

FRANK J. COLEMAN, District Judge.

The plaintiff, state of Russia, seeks to recover a fund of approximately $151,449 which is the credit balance in a special deposit account in the defendant National City Bank. The account is in the name of plaintiff's alleged agent, who actuated this suit, Serge Ughet, whom the American government recognizes as the financial attaché of the Russian embassy, even in the absence of an ambassador, and as the custodian of the property of the Russian government in this country. The account was opened in August, 1918, for the express purpose of segregating a fund theretofore held by the Bankers' Trust Company. During the intervening fifteen years, the Bankers' Trust Company has refused to grant the release, and this suit is brought to compel it to do so or to obtain an adjudication that an express release is unnecessary in order to entitle the plaintiff to obtain the money from the National City Bank.

The money had been deposited in the Bankers' Trust Company in December, 1917, in the joint account of three individuals, G. Lomonosoff, Count Shulenberg, and A. Lipetz, who were the duly authorized agents of the so-called Kerensky government of Russia. That government had already been overthrown, but its successor has never been recognized by the American executive, and the recognition theretofore extended to the Kerensky agents has not been abrogated in general. Unquestionably the money when deposited in the Bankers' Trust Company was owned by

418

the Russian state, whatever may have been the prevailing government, and the joint depositors in whose names it was placed were merely acting as agents for their country under an authority recognized by the American executive.

In the spring of 1918 one of the joint depositors, Lomonosoff, went over to the side of the new Soviet government, his authority to act further for his Kerensky superiors was terminated, and the American executive took due recognition of that fact. Thereafter a dispute arose among the joint depositors as to who had dominion over the account, and Lomonosoff on June 18th formally notified the Bankers' Trust Company that he claimed exclusive title to the fund and terminated the authority of the others to draw against it. His claim was apparently based upon the right of the unrecognized Soviet government, though there was some intimation of a personal interest which was later abandoned. At any rate, the evidence conclusively shows that he had no personal right, and that the only money which entered the account was that of the Russian state.

The two other depositors, on the other hand, in order to secure the fund for the recognized authorities of the Russian state, drew a check against the account to the order of Serge Ughet as Russian financial attaché for about the amount of the balance, $115,333.06, which the Bankers' Trust Company at first refused to honor, though it was drawn in accordance with the original deposit agreement by two of the named depositors. After negotiation between Ughet and the Trust Company, they agreed that the latter should pay the check upon condition that the proceeds be segregated in a deposit account in the National City Bank, which was done on August 14, 1918. All the money in the joint account was accordingly paid out by the Bankers' Trust Company on the checks of the two joint depositors contrary to the claim of Lomonosoff, and the account was closed; and it was all segregated in the special account of Serge Ughet as Russian financial attaché in the National City Bank, where through the addition of interest the balance is now about $151,449.

The agreement as to the segregation of the fund is evidenced by a letter from the National City Bank to the Bankers' Trust Company reading as follows:

"In accordance with instructions from Mr. S. Ughet, Financial Attaché to the Russian Embassy at Washington, D. C., we have segregated and hold in a separate fund the sum of $115,333.06. Such fund we will hold until you are furnished with evidence satisfactory to you that the balance of the account, to wit, $115,333.06 which stood on your books in the names of Messrs. Lomonosoff, Shulenberg and Lipetz at the close of yesterday's business and which balance we have this day received from you in payment of a check thereon signed by Messrs. Shulenberg and Lipetz, and all of which we have credited to the Russian Government, is the sole and exclusive property of the Russian Government, such check having been so paid by you upon our agreement to send you this letter and comply with the terms thereof. If suit should be commenced against you by G. Lomonosoff, one of the parties above-named, or by any one claiming through him, for the recovery from you of the whole or any part of the balance of the account above referred to, prior to the receipt by you of such satisfactory evidence and the receipt by us from you of a letter which you have received such satisfactory evidence, which letter you agree to send to us as soon as such evidence is received by you, we will, on demand, and on receipt of a copy of the summons and complaint in such action, pay over to you the sum sued for, not exceeding however, $115,333.06, and such interest as we may allow thereon; such sum so paid over to be thereafter held by you until the ownership of the balance of the account or part thereof so sued for by the said G. Lomonosoff is legally or otherwise determined and to be then applied by you in accordance with the ownership as so determined.

"It is understood that the Financial Attache to the Russian Embassy at Washington, D. C., shall be allowed by you an opportunity to defend any such suit, but at the expense of his Government, and that in the event of the final termination of any such suit without the plaintiff therein recovering judgment, the sum so paid over to you by us with such interest as you allow thereon shall be returned by you to us for the account of the Russian Government."

Fifteen years have elapsed, but neither Lomonosoff nor any one claiming through him has brought any proceeding against the Bankers' Trust Company, though both he and an unrecognized agent of the Soviet government in 1919 demanded the money from the trust company on behalf of the Soviet government. Prior to the bringing of the present suit, Ughet furnished the Bankers' Trust Company with adequate proof of the source of the deposits, and demanded a release of the fund,

which was refused on the ground that the company was not satisfied that he was entitled to receive the money.

■ 1. The suit is properly brought in the name of the State of Russia to enforce the agreement of August 14, 1918, and to determine the plaintiff's rights in the fund created. Though the letter above quoted is from the National City Bank to the Bankers' Trust Company, it is merely evidence of the agreement made with Ughet in which both banks recognized that he was acting merely as agent for the Russian state in obtaining payment of the balance in the account in the Bankers' Trust Company and in establishing a segregated fund which might serve as indemnity to the Bankers' Trust Company. The ownership of the fund and the right under the contract to obtain its release from segregation are in the plaintiff, which is the real party in interest.

■ The court is precluded from inquiring whether Ughet as Russian financial attaché had actual authority from the plaintiff in making the agreement which the plaintiff alleges and in causing this suit to be brought, because of the express recognition of his authority by the political branch of the American government which has been certified to by the Secretary of State. Lehigh Valley R. R. Co. v. State of Russia (C. C. A.) 21 F.(2d) 396. Notwithstanding the differences in the facts, the principles of that decision are clearly controlling in this.

■ 2. There is no defect of parties in the failure to name Lomonosoff as a defendant. His presence is unnecessary either for his own protection or that of the Bankers' Trust Company. He was not a party to the contract in suit, and has no interest in the fund established under it. The segregation was not for his protection, but to indemnify the Bankers' Trust Company in case of a suit by him, and under the agreement the fund was in no case to be turned over to him by the National City Bank, but to be returned to the Bankers' Trust Company as indemnity. His only possible claim would be for breach of the original deposit agreement which has been terminated as to the two other depositors and their principal by the payment of their checks to the order of Ughet. If this payment did not release Lomonosoff's claim against the trust company, the latter remained liable to him and might be entitled to a return of the fund, but not for his benefit.

As to the protection of the Bankers' Trust Company, the evidence conclusively shows that Lomonosoff never had any individual right under the deposit agreement nor interest in the moneys deposited. He was acting solely as agent for his ultimate principal, the sovereign state of Russia, but his agency had been terminated within the express recognition of the American executive, and he therefore cannot enforce any of his principal's rights. Furthermore, his principal has no rights under the original deposit agreement because it has been fully paid; it is now in its own name seeking to enforce its rights under the segregation agreement, and the presence of its former agent is entirely unnecessary for any one's protection. This conclusion is reinforced by the lapse of fifteen years which, in addition to its evidentiary value, might well bar any other proceeding under the statute of limitations.

■ 3. The segregation agreement provided that the fund would be held until the Bankers' Trust Company was "furnished with evidence satisfactory to you (Bankers' Trust Company) that the balance of the account (the joint account) * * * is the sole and exclusive property of the Russian government. * * *" The evidence furnished admits of no doubt as to what were the facts, and the Bankers' Trust Company does not dispute them. In this sense the evidence furnished could not be unsatisfactory. The only doubt which could arise is as to the law, whether the agents originally appointed by the Kerensky government had authority to act for the Russian state after the revolution. All the deposits made in the joint account were of government funds which had been held by the recognized agents of the Kerensky government at a time when it was the actual government of Russia. The effect of the revolution on the ownership of the funds and on the authority of the agents to deal with them raised legal questions as to which the Bankers' Trust Company may have been actually unsatisfied. But that did not make the evidence unsatisfactory. It was presumed to know the law, and whatever actual doubts it may have had in that regard would not support the assertion that the evidence was unsatisfactory to it.

4. Under the segregation agreement, therefore, the Bankers' Trust Company is not entitled to have the fund held any longer for its indemnification. It is unnecessary, however, to direct the formality of a letter of release, since a decree adjudicating that the balance in the special account is freed of any claim by the Bankers' Trust Company will serve the same purpose.

5. The relief which the plaintiff asks against the National City Bank is that the balance in the special account be paid over to the named depositor, Serge Ughet, as Russian financial attaché; and the bank interposes a set-off and a counterclaim based upon a separate indebtedness of $4,435,000 owed by the plaintiff to the bank. The indebtedness, which is undisputed, is for the amount of the plaintiff's promissory notes held by the bank since 1917. The defendant seeks not only to offset the notes against the credit balance in the special account, but to obtain an affirmative judgment for the excess.

The notes were in no way connected with the account; they had been held by the bank long before the account was opened. It may be that some of the money advanced upon them was what was deposited in the Bankers' Trust Company, but, even so, it became the plaintiff's absolutely, and, in the absence of a rescission by the National City Bank, cannot be traced into the special account. The present credit balance in the special account, freed from the claim of the Bankers' Trust Company, constitutes a simple debt owed by the National City Bank entirely independent of the previously acquired notes.

■ 6. The plaintiff urges its sovereignty as a bar to offsetting the notes against its claim for the credit balance, on the ground that the two causes of action are entirely unconnected. Assuming for the moment that there is no one else interested in the result, it would seem to me inequitable to direct the defendant to pay its debt to the plaintiff when there is a counter debt of far larger amount justly due to the defendant for which it has no remedy. The plaintiff's sovereignty protects it from independent suit, and, furthermore, its property in this country amounts to only a very small part of its indebtedness here, so that, if the offset is barred, the defendant has no remedy whatever. It would be a little too much like tying a defendant hand and foot and letting a plaintiff go through his pockets, and the fact that the plaintiff is a sovereign state does not completely satisfy the moral sense. Concededly the sovereignty of the plaintiff would not protect it from an offset arising out of the same transaction, and it is impossible for me to distinguish the two situations on principles of justice apart from legalisms. In neither case is the defendant obliged in good conscience to pay what the plaintiff demands, even though the law for its own purposes analyzes the relations into a debt owed by the defendant and a counter debt owed to it. This separation may have importance when the rights of third parties intervene or where the defendant has an adequate remedy apart from an offset; but, in the absence of those circumstances, a decree directing the defendant to pay would be shocking to the moral sense, even though the plaintiff is a sovereign state.

There are undoubtedly valid practical reasons underlying the rules of sovereign immunity, and they may properly prevent a court from doing justice, but they do not require that a court of equity do an affirmative wrong. A foreign state may refuse to permit our courts to adjudicate its rights, but that does not mean that it can procure an adjudication so limited by it that a gross and manifest injustice is done to the defendant. It may be that such a plaintiff, when it sees what it has let itself in for, should be permitted to withdraw its suit; but, if it presses for a decision in a court of equity, the decree must conform to our concepts of justice.

7. But, apart from its sovereignty, the plaintiff contends that the offset is barred on the merits because of the circumstances under which the special account was opened. Eight months prior thereto, on November 28, 1917, the Russian ambassador, as the plaintiff's duly authorized representative, wrote the National City Bank that all the Russian government funds thereafter on deposit in the bank (with certain immaterial exceptions) were to be held in trust for four specified purposes, one of which was the payment of all Russian securities then held in the United States. The letter is not clear to me, but apparently the moneys were to remain at the free disposition of the plaintiff for any purpose that it saw fit, notwithstanding the declaration of trust, after all liabilities on contracts for supplies had been paid. All such liabilities were apparently paid before February, 1921, so that the plaintiff is now probably free from the declaration of trust. In any event, the plaintiff is not seeking to recover the fund as trustee, but in its individual right.

At about the time of the declaration of trust, a "gentlemen's agreement" was made between the plaintiff, the bank, and the Secretary of the Treasury that there would be no withdrawal from any account except on the Secretary's approval; and during the ensuing years it was the uniform practice to procure such approval for each specific withdrawal. This arrangement was not legally binding, and there was no contract or rule of law which required that it be followed, so that the fact that the Secretary of the Treasury has not approved the payment of the bank's claim out

of the balance in the special account is without significance.

In February, 1921, the plaintiff, through its representative, Ughet, informed the Secretary of the Treasury that, all its liabilities on contracts for supplies having been paid, the balance in the plaintiff's accounts would be turned over to the United States government in partial payment of indebtedness owed to it. The National City Bank had no notice of this, and is in no way bound by it. The letter did not amount to an assignment to the United States government, as is shown by the fact that the plaintiff in its own right is seeking to recover the fund. It may be assumed that, if the plaintiff should recover, it would pay the sum to the United States government, but the question to be determined is whether it has the right to recover, regardless of what disposition it might make of the proceeds.

Counsel for the plaintiff has not made plain (or I have been unable to grasp) his exact theory upon which the above facts should be deemed to bar the offset. It is true that at the time the special account was opened it was subject to the claim of the Bankers' Trust Company, which is eliminated by this decision; the notes held by the National City Bank were not yet due, but did mature in 1919; there was a declaration of trust in existence which covered the account, but it is not alleged as the basis of the plaintiff's claim, and, furthermore, its purposes have either been entirely fulfilled or are not at variance with the offset; finally, there was the "gentlemen's agreement" by which all withdrawals were subject to the approval of the American government, but it was entirely voluntary. Those facts might have had significance if the right to offset were predicated upon an implied agreement at the time of opening the special account, that the defendant would have the right to pay itself out of the credit balance. But the right to offset is not dependent on an implied agreement; it arises from the fact that the plaintiff is seeking in its own right to recover money from a defendant to which it justly owes a far larger sum. There was no waiver by the defendant of its claim nor an implied agreement that it would not be offset. It matured in 1919, after the special account was opened, but six years before the plaintiff's cause of action matured through a proffer of the evidence specified in the segregation agreement; and the notes had been held for more than a year before the opening of the special account. The fault may be mine, but frankness compels me to state that I have no inkling as to the theoretical basis of plaintiff's contention that the above facts bar the offset.

8. The offset must therefore be allowed, and this involves a determination of the amount of it. Injustice to the defendant would be prevented by merely finding that the offset is sufficient to defeat the plaintiff's recovery, but equity ought not to leave the adjudication incomplete. There should be a determination of the exact amount due to the National City Bank, without, of course, any direction that the plaintiff pay the excess or that it be subject to a judgment for the excess.

Settle decree accordingly, but without costs.