## GUARANTY TRUST CO. *v.* UNITED STATES.

No. 566.   Argued March 28, 29, 1938.—Decided April 25, 1938.

*Mr. John W. Davis,* with whom *Mr. Ralph M. Carson* was on the brief, for petitioner.

*Assistant Attorney General Whitaker,* with whom *Solicitor General Jackson,* and *Messrs. David E. Hudson, Paul A. Sweeney,* and *Edward J. Ennis* were on the brief, for the United States.

MR. JUSTICE STONE delivered the opinion of the Court.

The principal questions for decision are whether, in a suit at law brought in a federal district court to recover the deposit of a foreign government with a New York bank, such government is subject to the local statute of limitations as are private litigants; and, if so, whether the assignment of November 16, 1933, by the Russian Soviet Government to the United States of the right of the former to the bank account restricts or overrides the operation of the statute of limitations. A subsidiary question is whether in the circumstances of the case the running of the statute of limitations, if otherwise applicable, was affected by our nonrecognition of the Soviet Government during the interval of approximately sixteen years between recognition of the Provisional Government of Russia and recognition of its successor.

On July 15, 1916, the Imperial Russian Government opened a bank account with petitioner, the Guaranty Trust Company, a New York banking corporation. On March 16, 1917, the Imperial Government was overthrown and was succeeded by the Provisional Government of Russia which was recognized by the United States on March 22, 1917. On July 5, 1917, Mr. Boris Bakhmeteff was officially recognized by the President as the Ambassador of Russia. On July 12, 1917, the account being overdrawn, $5,000,000 was deposited in the account by Mr. Serge Ughet, Financial Attache of the Russian Embassy in the United States. On November 7, 1917, the Provisional Government was overthrown and was succeeded by the government of the Union of Soviet Socialist Republics, which will be referred to as the Soviet Government. At that time there remained on deposit in the account the sum of approximately $5,000,000. On November 28, 1917, the Soviet Government dismissed Bakhmeteff as Ambassador and Ughet as Financial At-

tache. But the United States continued to recognize Bakhmeteff as Ambassador until on June 30, 1922, he withdrew from his representation of the Russian Government. Thereafter, until November 16, 1933, it continued to recognize the Financial Attache, and after the retirement of Bakhmeteff as Ambassador it recognized the former as custodian of Russian property in the United States.

On November 16, 1933, the United States recognized the Soviet Government, and on that date took from it an assignment of all "amounts admitted to be due that may be found to be due it, as the successor of prior Governments of Russia, or otherwise, from American nationals, including corporations . . ." After making demand upon the petitioner for payment of the balance of the account the United States, on Setember 21, 1934, brought the present suit in the district court for southern New York to recover the deposit. Petitioner then moved under the Conformity Act, 28 U. S. C. § 724; New York Civil Practice Act, § 307; and Rules 107 and 120 of the New York Rules of Civil Practice, to dismiss the complaint on the ground that the recovery was barred by the New York six year statute of limitations.

In support of the motion petitioner submitted numerous affidavits, two depositions, and other documentary proof tending to show that on February 25, 1918, it had applied the balance of the account as a credit against indebtedness alleged to be due to it by the Russian Government by reason of the latter's seizure of certain ruble deposit accounts of petitioner in Russian private banks; that on that date it had repudiated all liability on the deposit account; and that it had then given notice of such repudiation to the Financial Attache of the Russian Embassy and later both to the Financial Attache and to Bakhmeteff as Ambassador. The United States submitted affidavits and exhibits in opposition. The district court

found that petitioner had repudiated liability on the account on February 25, 1918; that it had given due notice of repudiation prior to June 30, 1922 to both the Financial Attache and Ambassador Bakhmeteff; and that recovery was barred by the applicable six year statute of limitations of New York. New York Civil Practice Act, § 48. The Court of Appeals for the second circuit reversed the judgment for petitioner, holding that the New York statute of limitations does not run against a foreign sovereign. 91 F. (2d) 898. Moved by the importance of the questions involved, we granted certiorari.

Respondent argues that the Soviet Government, in a suit brought in the federal courts, is not subject to the local statute of limitations, both because a foreign, like a domestic, sovereign is not subject to statutes of limitations, and its immunity as in the case of a domestic sovereign constitutes an implied exception to that statute and to the Conformity Act; and because in any case, since no suit to recover the deposit could have been maintained in New York by the Soviet Government prior to its recognition by the United States, and since according to New York law the statute does not run during the period when suit cannot be brought, the present suit is not barred. It is insisted further that even though the Soviet Government is bound by the local statute of limitations the United States is not so bound, both because the New York statute which bars the remedy but does not extinguish the right is not applicable to the United States, and because the statute is inoperative and ineffective since it conflicts with and impedes the execution of the Executive Agreement between the Soviet Government and the United States by which the assignment was effected. Finally, the Government assails the finding of fact of the district court that petitioner repudiated the liability upon the deposit account, and contends that notice of the repudiation given by petitioner to representa-

tives of the Provisional Government was ineffective to set the statute running against the Soviet Government and in favor of petitioner.

*First.* The rule *quod nullum tempus occurrit regi*— that the sovereign is exempt from the consequences of its laches, and from the operation of statutes of limitations— appears to be a vestigial survival of the prerogative of the Crown. See *Magdalen College Case,* 11 Co. Rep. 66b, 74b; Hobart, L. C. J. in *Sir Edward Coke's Case,* Godb. 289, 295; Bracton, De Legibus, Lib. ii, c. 5, § 7. But whether or not that alone accounts for its origin, the source of its continuing vitality where the royal privilege no longer exists is to be found in the public policy now underlying the rule even though it may in the beginning have had a different policy basis. Compare Maine, Ancient Law (10th ed., 1930) 32 *et seq.* "The true reason . . . is to be found in the great public policy of preserving the public rights, revenues, and property from injury and loss, by the negligence of public officers. And though this is sometimes called a prerogative right, it is in fact nothing more than a reservation, or exception, introduced for the public benefit, and equally applicable to all governments." Story, J., in *United States* v. *Hoar,* Fed. Cas. No. 15,373, p. 330. Regardless of the form of government and independently of the royal prerogative once thought sufficient to justify it, the rule is supportable now because its benefit and advantage extend to every citizen, including the defendant, whose plea of laches or limitation it precludes; and its uniform survival in the United States has been generally accounted for and justified on grounds of policy rather than upon any inherited notions of the personal privilege of the king. *United States* v. *Kirkpatrick,* 9 Wheat. 720, 735; *United States* v. *Knight,* 14 Pet. 301, 315; *United States* v. *Thompson,* 98 U. S. 486, 489; *Fink* v. *O'Neil,* 106 U. S. 272, 281; *United States* v. *Nashville, C. & St. L.*

*R. Co.*, 118 U. S. 120, 125. So complete has been its acceptance that the implied immunity of the domestic "sovereign," state or national, has been universally deemed to be an exception to local statutes of limitations where the government, state or national, is not expressly included; and to the Conformity Act. See *United States v. Thompson, supra.*

Whether the benefit of the rule should be extended to a foreign sovereign suing in a state or federal court is a question to which no conclusive answer is to be found in the authorities. Diligent search of counsel has revealed no judicial decision supporting such an application of the rule in this or any other country. The alleged immunity was doubted in *French Republic* v. *Saratoga Vichy Spring Co.*, 191 U. S. 427, 437, and in *Commissioners of the Sinking Fund* v. *Buckner*, 48 Fed. 533. It was rejected in *Western Lunatic Asylum* v. *Miller*, 29 W. Va. 326, 329; 1 S. E. 740, and was disregarded in *Royal Italian Government* v. *International Committee of Y. M. C. A.*, 273 N. Y. 468; 6 N. E. 2d 407, where neither appellate court delivered an opinion.

The only support found by the court below for a different conclusion is a remark in the opinion of the Court in *United States* v. *Nashville, C. & St. L. R. Co., supra,* where its holding that the United States, suing in a federal court, is not subject to the local statute of limitations, was said to rest upon a great principle of public policy "applicable to all governments alike." The statement is but a paraphrase, which has frequently appeared in judicial opinion,[1] of Mr. Justice Story's statement in *United States* v. *Hoar, supra,* already quoted. His reference to the public policy supporting the rule that limitation does not run against a domestic sovereign as "equally appli-

---

[1] *United States* v. *Knight*, 14 Pet. 301, 315; *Gibson* v. *Chouteau*, 13 Wall. 92, 99; *United States* v. *Thompson*, 98 U. S. 486, 490; *Fink* v. *O'Neil*, 106 U. S. 272, 281.

cable to all governments" was obviously designed to point out that the policy is as applicable to our own as to a monarchical form of government, and is therefore not to be discarded because of its former identity with the royal prerogative. We can find in that pronouncement and in its later versions no intimation that the policy underlying exemption of the domestic sovereign supports its extension to a foreign sovereign suing in our courts.

It is true that upon the principle of comity foreign sovereigns and their public property are held not to be amenable to suit in our courts without their consent. See *The Exchange,* 7 Cranch 116; *Berizzi Bros. Co.* v. *S. S. Pesaro,* 271 U. S. 562, *Compania Espanola* v. *The Navemar,* 303 U. S. 68. But very different considerations apply where the foreign sovereign avails itself of the privilege, likewise extended by comity, of suing in our courts. See *The Sapphire,* 11 Wall. 164, 167; *Russian S. F. S. Republic* v. *Cibrario,* 235 N. Y. 255; 139 N. E. 259. By voluntarily appearing in the rôle of suitor it abandons its immunity from suit and subjects itself to the procedure and rules of decision governing the forum which it has sought. Even the domestic sovereign by joining in suit accepts whatever liabilities the court may decide to be a reasonable incident of that act. *United States* v. *The Thekla,* 266 U. S. 328, 340, 341; *United States* v. *Stinson,* 197 U. S. 200, 205; *The Davis,* 10 Wall. 15; *The Siren,* 7 Wall. 152, 159.[2] As in the case of the domestic sovereign

---

[2] A foreign sovereign as suitor is subject to the local rules of the domestic forum as to costs, *Republic of Honduras* v. *Soto,* 112 N. Y. 310; 19 N. E. 845; *Emperor of Brazil* v. *Robinson,* 5 Dowl. Pr. 522; *Otho, King of Greece,* v. *Wright,* 6 Dowl. Pr. 12; *The Beatrice,* 36 L. J. Rep. Adm. (N. S.) 10; *Queen of Holland* v. *Drukker,* (1928) Ch. 877, 884, although the local soverign does not pay costs. *United States* v. *Verdier,* 164 U. S. 213, 219. The foreign sovereign suing as a plaintiff must give discovery. *Rothschild* v. *Queen of Portugal,* 3 Y. & C. Ex. 594, 596; *United States* v. *Wagner,* L. R. 2 Ch. App. 582, 592, 595; *Prioleau* v. *United States,* L. R. 2 Eq. 659. A foreign

in like situation, those rules, which must be assumed to be founded on principles of justice applicable to individuals, are to be relaxed only in response to some persuasive demand of public policy generated by the nature of the suitor or of the claim which it asserts. That this is the guiding principle sufficiently appears in the many instances in which courts have narrowly restricted the application of the rule *nullum tempus* in the case of the domestic sovereign.[3] It likewise appears from those cases which justify the rule as applied to the United States suing in a state court, on the ground that it is sovereign within the state and that invocation of the rule *nullum tempus* protects the public interest there as well as in every other state. *United States* v. *Beebe,* 127 U. S. 338; *Swearingen* v. *United States,* 11 Gill. & J. 373; *McNamee* v. *United States,* 11 Ark. 148; cf. *United States* v. *California,* 297 U. S. 175, 186.

We are unable to discern in the case where a foreign sovereign, by suit, seeks justice according to the law of the forum, any of the considerations of public policy

---

sovereign plaintiff "should so far as the thing can be done be put in the same position as a body corporate." *Republic of Costa Rica* v. *Erlanger,* L. R. 1 Ch. D. 171, 174; *Republic of Peru* v. *Weguelin,* L. R. 20 Eq. 140, 141; cf. *King of Spain* v. *Hullett,* 7 Bligh N. S. 359, 392.

[3] The presumption of a grant by lapse of time will be indulged against the domestic sovereign. *United States* v. *Chaves,* 159 U. S. 452, 464. The rule *nullum tempus* has never been extended to agencies or grantees of the local sovereign such as municipalities, county boards, school districts and the like. *Metropolitan R. Co.* v. *District of Columbia,* 132 U. S. 1; *Boone County* v. *Burlington & Missouri River R. Co.,* 139 U. S. 684, 693. It has been held not to relieve the sovereign from giving the notice required by local law to charge endorsers of negotiable paper, *United States* v. *Barker,* 12 Wheat. 559; cf. *Cooke* v. *United States,* 91 U. S. 389, 398; *Wilber National Bank* v. *United States,* 294 U. S. 120, 124, and in tax cases has been narrowly construed against the domestic sovereign. *Bowers* v. *New York & Albany Lighterage Co.* 273 U. S. 346, 350. Compare *United States* v. *Knight,* 14 Pet. 301; *Fink* v. *O'Neil,* 106 U. S. 272.

which support the application of the rule *nullum tempus* to a domestic sovereign. The statute of limitations is a statute of repose, designed to protect the citizens from stale and vexatious claims, and to make an end to the possibility of litigation after the lapse of a reasonable time. It has long been regarded by this Court and by the courts of New York as a meritorious defense, in itself serving a public interest. *Bell* v. *Morrison*, 1 Pet. 351, 360; *M'Cluny* v. *Silliman*, 3 Pet. 270, 278; *Campbell* v. *Haverhill*, 155 U. S. 610, 617; *United States* v. *Oregon Lumber Co.*, 260 U. S. 290; *Brooklyn Bank* v. *Barnaby*, 197 N. Y. 210, 227; 90 N. E. 834; *Schmidt* v. *Merchants Despatch Transportation Co.*, 270 N. Y. 287, 302; 200 N. E. 824. Denial of its protection against the demand of the domestic sovereign in the interest of the domestic community of which the debtor is a part could hardly be thought to argue for a like surrender of the local interest in favor of a foreign sovereign and the community which it represents. We cannot say that the public interest of the forum goes so far.

We lay aside questions not presented here which might arise if the national government, in the conduct of its foreign affairs, by treaty or other appropriate action, should undertake to restrict the application of local statutes of limitations against foreign governments, or if the states in enacting them should discriminate against suits brought by a foreign government. We decide only that in the absence of such action the limitation statutes of the forum run against a foreign government seeking a remedy afforded by the forum, as they run against private litigants.

*Second.* Respondent, relying on the New York rules that the statute of limitations does not run against a suit to recover a bank account until liability upon it is repudiated, *Tillman* v. *Guaranty Trust Co.*, 253 N. Y. 295; 171 N. E. 61, and that the statute of limitations

does not run against a plaintiff who has no forum in which to assert his rights, *Oswego & Syracuse R. Co.* v. *State,* 226 N. Y. 351, 359, 362; 124 N. E. 8; *Cayuga County* v. *State,* 153 N. Y. 279, 291; 47 N. E. 288; *Parmenter* v. *State,* 135 N. Y. 154, 163; 31 N. E. 1035, argues that until recognition of the Soviet Government there was no person to whom notice of petitioner's repudiation could be given and no court in which suit could be maintained to recover the deposit.

It is not denied that, in conformity to generally accepted principles, the Soviet Government could not maintain a suit in our courts before its recognition by the political department of the Government. For this reason access to the federal and state courts was denied to the Soviet Government before recognition. *The Penza,* 277 Fed. 91; *The Rogdai,* 278 Fed. 294; *Russian S. F. S. Republic* v. *Cibrario,* 235 N. Y. 255; *Preobazhenski* v. *Cibrario,* 192 N. Y. Supp. 275. But the argument ignores the principle controlling here and recognized by the courts of New York that the rights of a sovereign state are vested in the state rather than in any particular government which may purport to represent it, *The Sapphire, supra,* 168, and that suit in its behalf may be maintained in our courts only by that government which has been recognized by the political department of our own government as the authorized government of the foreign state. *Jones* v. *United States,* 137 U. S. 202, 212; *Russian Government* v. *Lehigh Valley R. Co.,* 293 Fed. 133, 135, aff'd *sub nom. Lehigh Valley R. Co.* v. *State of Russia,* 21 F. (2d) 396, 409; *Matter of Lehigh Valley R. Co.,* 265 U. S. 573; *Russian S. F. S. Republic* v. *Cibrario, supra;* Moore, International Law Digest, §§ 75, 78.

What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government  Objections to its deter-

138

mination as well as to the underlying policy are to be addressed to it and not to the courts. Its action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts, which are bound to accept that determination, although they are free to draw for themselves its legal consequences in litigations pending before them. *Jones* v. *United States, supra,* 212; *Agency of Canadian Car & F. Co.* v. *American Can Co.,* 258 Fed. 363; *Lehigh Valley R. Co.* v. *State of Russia, supra.*

We accept as conclusive here the determination of our own State Department that the Russian State was represented by the Provisional Government through its duly recognized representatives from March 16, 1917 to November 16, 1933, when the Soviet Government was recognized.[4] There was at all times during that period a recog-

---

[4] The United States accorded recognition to the Provisional Government March 16, 1917 and continued to recognize it until November 16, 1933, when the Soviet Government was recognized. During that period the United States declined to recognize the Soviet Government or to receive its accredited representative, and so certified in litigations pending in the federal courts. *The Penza, supra; The Rogdai, supra.* It recognized Mr. Bakhmeteff as Russian Ambassador from July 5, 1917 until June 30, 1922, when he retired, having designated Mr. Ughet as custodian of Russian property in the United States. Mr. Ughet, after his appointment as Financial Attache April 7, 1917, continued to be recognized as such by the United States until November 16, 1933. He was recognized by the United States as Charge d'Affaires ad interim, during the absence of the Ambassador from December 3, 1918 to July 31, 1919. Their diplomatic status as stated was certified in the present suit by the Secretary of State, who stated that he considered Mr. Ughet's status unaffected by the termination of the Ambassador's duties.

Their status was certified to by the Department on October 31, 1918 and July 2, 1919, respectively, in *Russian Government* v. *Lehigh Valley R. Co.,* 293 Fed. 133. Mr. Bakhmeteff's status as Ambassador was certified May 18, 1919 in *Agency of Canadian Car & Foundry Co.* v. *American Can Co.,* 258 Fed. 363, 368; on April 6, 1920 in *The Rogdai,* 278 Fed. 294, 295; on June 24, 1919 in *The Penza,*

nized diplomatic representative of the Russian State to whom notice concerning its interests within the United States could be communicated, and to whom our courts were open for the purpose of prosecuting suits in behalf of the Russian State. In fact, during that period suits were brought in its behalf in both the federal and state courts, which consistently ruled that the recognized Ambassador and Financial Attache were authorized to maintain them.[5]

We do not stop to inquire what the "actual" authority of those diplomatic representatives may have been. When the question is of the running of the statute of limitations, it is enough that our courts have been open to suit on behalf of the Russian State in whom the right to sue upon the petitioner's present claim was vested, and that the political department of the Government has accorded recognition to a government of that state, received its diplomatic representatives, and extended to them the privilege of maintaining suit in our courts in behalf of their state. The right and opportunity to sue upon the claim against petitioner was not suspended; and notice of repudiation of the liability given to the duly recognized diplomatic representatives must, so far as our

---

277 Fed. 91, 93. Certificate with respect to both Mr. Bakhmeteff and Mr. Ughet was given February 19, 1923 and with respect to Mr. Ughet December 22, 1927. On the faith of the two last mentioned certificates the Court, in the *Lehigh Valley Railroad* case, *supra,* as stated by the Government's brief in the present case, ordered to be paid to Mr. Ughet approximately $1,000,000, of which more than $700,000 was paid to the United States Treasurer "on account of interest due on obligations of the Provisional Government of Russia by the Treasurer."

[5] *Russian Government* v. *Lehigh Valley R. Co.,* 293 Fed. 133; 293 Fed. 135, aff'd 21 F. (2d) 396; *State of Russia* v. *Bankers' Trust Co.,* 4 F. Supp. 417, 419, aff'd 83 F. (2d) 236. See also *Agency of Canadian Car & Foundry Co.* v. *American Can Co.,* 258 Fed. 363.

own courts are concerned, be taken as notice to the state which they represented.

The Government argues that recognition of the Soviet Government, an action which for many purposes validated here that government's previous acts within its own territory, see *Underhill* v. *Hernandez*, 168 U. S. 250; *Oetjen* v. *Central Leather Co.*, 246 U. S. 297; *Ricaud* v. *American Metal Co.*, 246 U. S. 304; *United States* v. *Belmont*, 301 U. S. 324; *Dougherty* v. *Equitable Life Assurance Society*, 266 N. Y. 71, 84, 85; 193 N. E. 897; *Luther* v. *Sagor & Co.*, [1921] 3 K. B. D. 532, operates to set at naught all the legal consequences of the prior recognition by the United States of the Provisional Government and its representatives, as though such recognition had never been accorded. This is tantamount to saying that the judgments in suits maintained here by the diplomatic representatives of the Provisional Government, valid when rendered, became invalid upon recognition of the Soviet Government. The argument thus ignores the distinction between the effect of our recognition of a foreign government with respect to its acts within its own territory prior to recognition, and the effect upon previous transactions consummated here between its predecessor and our own nationals. The one operates only to validate to a limited extent acts of a *de facto* government which by virtue of the recognition, has become a government *de jure*. But it does not follow that recognition renders of no effect transactions here with a prior recognized government in conformity to the declared policy of our own Government. The very purpose of the recognition by our Government is that our nationals may be conclusively advised with what government they may safely carry on business transactions and who its representatives are. If those transactions, valid when entered into, were to be disregarded after the later recognition of a successor government, recognition

would be but an idle ceremony, yielding none of the advantages of established diplomatic relations in enabling business transactions to proceed, and affording no protection to our own nationals in carrying them on.

So far as we are advised no court has sanctioned such a doctrine. The notion that the judgment in suits maintained by the representative of the Provisional Government would not be conclusive upon all successor governments, was considered and rejected in *Russian Government* v. *Lehigh Valley R. Co., supra.* An application for writ of prohibition was denied by this Court. 265 U. S. 573. We conclude that the recognition of the Soviet Government left unaffected those legal consequences of the previous recognition of the Provisional Government and its representatives, which attached to action taken here prior to the later recognition.

*Third.* If the claim of the Russian Government was barred by limitation the United States as its assignee can be in no better position either because of the rule *nullum tempus* or by virtue of the terms of the assignment. We need waste no time on refinements upon the suggested distinction between rights and remedies, for we may assume for present purposes that the United States acquired by the assignment whatever rights then survived the running of the statute against the Russian Government, and that it may assert those rights subject to such plea of limitations as may be made by petitioner.

As has already been noted, the rule *nullum tempus* rests on the public policy of protecting the domestic sovereign from omissions of its own officers and agents whose neglect, through lapse of time, would otherwise deprive it of rights. But the circumstances of the present case admit of no appeal to such a policy. There has been no neglect or delay by the United States or its agents, and it has lost no rights by any lapse of time after the assignment. The question is whether the exemption of the United States

from the consequences of the neglect of its own agents is enough to relieve it from the consequences of the Russian Government's failure to prosecute the claim. Proof, under a plea of limitation, that the six-year statutory period had run before the assignment offends against no policy of protecting the domestic sovereign. It deprives the United States of no right, for the proof demonstrates that the United States never acquired a right free of a preexisting infirmity, the running of limitations against its assignor, which public policy does not forbid. *United States* v. *Buford*, 3 Pet. 12, 30; *King* v. *Morrall*, 6 Price 24, 28, 30.

Assuming that the respective rights of petitioner and the Soviet Government could have been altered and that petitioner's right to plead the statute of limitations curtailed by force of an executive agreement between the President and the Soviet Government, we can find nothing in the agreement and assignment of November 16, 1933, which purports to enlarge the assigned rights in the hands of the United States, or to free it from the consequences of the failure of the Russian Government to prosecute its claim within the statutory period.

The agreement and assignment are embodied in a letter of Mr. Litvinov, People's Commissar of Foreign Affairs of the Soviet Government, to the President and the President's letter of the same date in reply. So far as now relevant the document signed in behalf of the Soviet Government makes mention of "amounts admitted to be due or that may be found to be due it as the successor of prior governments or otherwise from American nationals, including corporations, companies, partnerships or associations." It purports to "release and assign all such amounts to the Government of the United States" and the Soviet Government agrees, preparatory to final settlement of claims between it and the United States and the claims of their nationals, "not to make any claims with

respect to . . . (b) Acts done or settlements made by or with the Government of the United States, or public officials of the United States, or its nationals, relating to property, credits, or obligations of any Government of Russia or nationals thereof." The relevant portion of the document signed by the President is expressed in the following paragraph:

"I am glad to have these undertakings by your Government and I shall be pleased to notify your Government in each case of any amount realized by the Government of the United States from the release and assignment to it of the amounts admitted to be due, or that may be found to be due."

There is nothing in either document to suggest that the United States was to acquire or exert any greater rights than its transferor or that the President by mere executive action purported or intended to alter or diminish the rights of the debtor with respect to any assigned claims, or that the United States, as assignee, is to do more than the Soviet Government could have done after diplomatic recognition—that is, collect the claims in conformity to local law. Even the language of a treaty wherever reasonably possible will be construed so as not to override state laws or to impair rights arising under them. *United States* v. *Arredondo,* 6 Pet. 691, 748; *Haver* v. *Yaker,* 9 Wall. 32, 34; *Dooley* v. *United States,* 182 U. S. 222, 230; *Nielsen* v. *Johnson,* 279 U. S. 47, 52; *Todok* v. *Union State Bank,* 281 U. S. 449, 454. The assignment left unaffected the right of petitioner to set up against the United States the previous running of the statute of limitations.

*Fourth.* Respondent assails the finding of the district court that there was an unqualified repudiation by petitioner of its liability on the account, and in support of its contention presents an elaborate review of the evidence. The evidence is said to establish that petitioner's

alleged repudiation was tentative and conditional, to await negotiations with a stable Russian government upon its recognition by the United States. If this contention be rejected, respondent insists that at least there is a conflict in the evidence and in the inferences which may be drawn from it which, under the local practice, should have been resolved by a full trial rather than summarily on motion. As these questions were not passed on by the Court of Appeals, the case will be remanded to that court for further proceedings in conformity with this opinion.

*Reversed.*

MR. JUSTICE CARDOZO and MR. JUSTICE REED took no part in the consideration or decision of this case.