**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Orville LESLIE, Dora Leslie, Orville L. Leslie, Jr., Benjamin T. Leslie and Otto L. Leslie, Defendants-Appellants.**

**No. 19597.**

United States Court of Appeals, Sixth Circuit.

Feb. 17, 1970.

---

T. George Sternberg, Bay City, Mich., for appellants.

Fred M. Mester, Asst. U. S. Atty., Detroit Mich., for appellee, James H. Brickley, U. S. Atty., Detroit, Mich., on brief.

Before WEICK and EDWARDS, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

WEICK, Circuit Judge.

Appellants, Leslies, were unconditional guarantors of payment of a negotiable promissory note in the amount of $80,-000, which was executed and delivered by Leslie Motors, Inc., a family-owned corporation, to Oscoda State Savings Bank of Oscoda, Michigan (Bank), and upon default it was endorsed by Bank to Small Business Administration (SBA), an agency of the Government.

Orville Leslie (now deceased) and Dora Leslie, were husband and wife, and the remaining defendants were their sons.

On December 11, 1959, Bank loaned $80,000 to Leslie Motors, Inc. SBA acted as underwriter for 90% of the loan. The corporation executed a note to Bank on SBA form 154. At the time of the execution of the note and in order to secure payment thereof, the corporation executed and delivered to Bank a mortgage on its real property, which consisted of a parcel of land with a building thereon which housed a sales and service facility of the Ford dealership operated by the corporation. As additional security, the corporation executed and delivered to Bank a chattel mortgage on furniture, fixtures, equipment, tools, and other personalty. Each of the defendants individually executed and delivered to Bank a written guaranty of payment of the note. The guaranties were written on SBA form 148A.

On March 7, 1962, following default by the corporation in payment of the note, Bank endorsed the note and assigned the real estate and chattel mortgages and the guaranty contracts to SBA. The balance due on the note was $75,721.02.

On November 14, 1962, the present action was commenced by the Government in the District Court against the defendants on the separate contracts of guaranty, and it sought to recover the full amount due thereon, plus interest.

On November 15, 1962, an action for foreclosure of the mortgage on real es-

tate by advertisement [1] was commenced by SBA. It bid in the real property at public sale for $55,969. The property was later redeemed from sale by Morris Motors, Inc., for $59,865.37. Morris Motors also purchased from SBA for $5,000, the collateral involved in the chattel mortgage, upon which payment the chattel mortgage was discharged.

At the trial the defendants raised two affirmative defenses. They contended: First, that since the Government had chosen a Michigan procedure to effect foreclosure of the mortgage on real property, it was required to follow the Michigan statute which they claim precluded it from maintaining an action against the guarantors once foreclosure was instituted; and Second, that the price bid by SBA on the real property was substantially less than its fair market value which would have been adequate to cover the amount still owing. The case was tried to the Court without a jury. The trial judge limited defendants' proof to the fair market value of the real property. He held that the evidence introduced by defendants—

"* * * as to value failed to take into account the loss of auto dealership franchise, or in the alternative, premised the assessment of value of the property on the continued existence of such a franchise. It would appear that the failure of the predecessor and successor dealership companies demonstrates the lack of realism in the opinions of defendants' witnesses respecting the cash market value of the property at the time of the foreclosure sale."

He rendered judgment in favor of the Government in the amount of $28,566.08, which was the balance due after application of the proceeds of sale. The Leslies have appealed therefrom.

■ We do not understand that the Government seriously contends that it was not bound by the requirements of the Michigan statute on foreclosure by advertisement, which it chose to utilize. When the United States invokes a remedy provided by state law to enforce its claim, in our opinion it is required to follow the procedures provided thereby. See United States v. John Hancock Mut. Life Ins. Co., 364 U.S. 301, 308, 81 S.Ct. 1, 5 L.Ed.2d 1 (1960); Guaranty Trust Co. of New York v. United States, 304 U.S. 126, 134, 58 S.Ct. 785, 82 L.Ed. 1224 (1938); United States v. Glendale Nursing Home, 356 F.2d 651, 654 (3d Cir. 1966).

■ The question for us to decide is whether the Government complied with the provisions of the applicable Michigan statutes providing for foreclosure by advertisement when it did not dismiss the prior action against defendants on the contracts of guaranty after it commenced foreclosure proceedings. Section 3204(2) provides, in order to maintain such a foreclosure:

"That no suit or proceeding shall have been instituted, at law, to recover the debt then remaining secured by such mortgage, or any part thereof; or if any suit or proceeding has been instituted, that the same has been discontinued, or that an execution upon the judgment rendered therein has been returned unsatisfied, in whole or in part; * * *."

It is not disputed that the Government had commenced a suit against the defendants as guarantors one day prior to commencement of foreclosure under the statute. Nor is it disputed that the Government did not discontinue that action after it commenced foreclosure proceedings. The defendants claim that the Government's failure to discontinue the action against them as guarantors

---

1. Michigan Statutes Annotated provide:
   "§ 27A.3201 Foreclosure of mortgages containing power of sale; right.]
   Sec. 3201
   Every mortgage of real estate, containing therein a power of sale, upon default being made in any condition of such mortgage, may be foreclosed by advertisement, in the cases and in the manner hereinafter specified. (CL '48, § 600.3201.)"

brings the Government squarely within the terms of § 3204. We disagree.

The statute was not enacted to protect guarantors of a note. As the Supreme Court of Michigan has stated:

"This statute [2] clearly refers to suits on the debt, and not to foreclosure proceedings on the mortgage, and its object is to prevent proceedings, at the same time to prosecute the personal liability *of the mortgagor* and pursue the land." Lee v. Clary, 38 Mich. 223, 227 (1878). (Emphasis added)

The language of Lee v. Clary is unmistakably clear that it is the purpose of the statute to force an election of remedies which if not made would create the possibility that the mortgagee could foreclose the mortgage and at the same time hold the maker of the note personally liable for the debt. *Accord,* Larzelere v. Starkweather, 38 Mich. 96, 105 (1878).

In the case before us, the debtor-mortgagor is Leslie Motors, Inc., not the defendants individually. No action was maintained against Leslie Motors on the debt. The action in the District Court was brought against the defendants in their capacity as guarantors. The guaranty is an obligation separate from the mortgage note. It is simply not the "debt" to which the statute refers. Because the obligation of guaranty is distinct from the debt, the Government was not maintaining an action against the debtor "to recover the debt then remaining secured * * *."

The guaranty executed by defendants was not conditioned by any requirement that the creditor proceed against the mortgagor or its property.[3] Since no condition was written into the contract, there was no requirement that the Government proceed against the mortgagor or its property prior to asserting its rights against the guarantors. See Krekel v. Thomasma, 255 Mich. 283, 288–289, 238 N.W. 255, 81 A.L.R. 786 (1931).

The Government could have elected to proceed solely against the guarantors, who were liable for the amount of the debt. It should not be penalized for electing to proceed also against the mortgaged property, thereby reducing the liability of the guarantors to the amount of the deficiency. We are of the opinion that the guarantors were not prejudiced in any respect by the foreclosure instituted by the Government. No judgment was rendered against them until after the foreclosure proceedings were completed.

■ The contention of Leslies that the Government bid in the property at foreclosure sale for an inadequate amount, is not supported by the evidence. Defendants relied on the testimony of three witnesses who were appraisers. The first, Charles E. Smith, made an appraisal on January 20, 1968, five years after the foreclosure sale. The method used was to appraise the value of the property as of the time of the appraisal by use of an assessor's manual. Mr. Smith then applied a percentage factor for depreciation to determine what the value of the property would have been five years earlier. It was his appraisal that the land with improvements had a value of $88,432 at the earlier period. To a question by the

2. The statute under discussion by the Michigan Court is a predecessor to § 27A.3204, which was substantially the same in all material respects.

3. In relevant parts the guaranty provided:
"Guaranty
December 11, 1959
"In order to induce Oscoda State Savings Bank, Oscoda, Michigan (hereinafter called 'Bank') to make a loan or loans, or renewal or extension thereof, to Leslie Motors, Inc., a Michigan corporation, (hereinafter called the 'Debtor'), the undersigned hereby *unconditionally guarantees* to Bank, its successors and assigns, the due and punctual payment when due, whether by acceleration or otherwise, in accordance with the terms thereof, of the principal of and interest on and all other sums payable, or stated to be payable, with respect to the note of the Debtor * * *." (Emphasis added)

Court, Mr. Smith answered that he did not think the Government had bid in the property at a fair price. However, Mr. Smith's opinion is weakened by his own testimony on cross-examination that he did not believe that property sold at a forced sale or foreclosure would bring the fair market value. He also admitted that his valuation did not include a factor that the property was disposed of by forced sale.

James L. Kavanaugh, the most qualified of defendants' experts, made an appraisal on August 9, 1962, six months prior to the foreclosure sale. He appraised the building and land at $85,000. However, on cross-examination, he too testified that this figure did not represent the price which would be obtained at a forced sale.

The third expert, Donald H. Jordan, was not very helpful. He made an appraisal on January 24, 1968. He determined that the replacement value of the property was $90,000. His testimony is not especially valuable since he did not know what the depreciation factor was to arrive at a value as of February 8, 1963; nor did he demonstrate any reliable method by which he arrived at his figure. During cross-examination the following exchange occurred:

"Q I am only asking you if there is any basis on how you arrive at $90,000?

A I feel this is what it's worth.

Q Is this a personal feeling you have based on 20 years in the real estate business?

A Yes.

Q Is this the only thing that it is based on then?

A Yes, I would say to you. I think that answers your question."

None of the appraisals made by the Leslies' appraisers was based on sales of comparable property, or on what a willing buyer would pay to a willing seller for such property. Leslies offered no such evidence.

The testimony of Leslies' witnesses is to be contrasted with that of the Government's witness. Edgar O. Schill was the appraiser for the SBA. Mr. Schill had been requested to make an appraisal of the property as of May, 1962, to determine its liquidating value. He defined "liquidating value" as:

"What we would expect to get from this property sold in distress or in foreclosure."

Taking into account the distressed situation of the business, he arrived at a figure of $85,000. He also had been requested to determine the liquidating value of the building and land if sold separately from the equipment and office furnishings. He arrived at a figure of $70,000. When asked how he arrived at this figure, he responded:

"The lack of sales and the type of building was single purpose for a new car agency and definitely single purpose. There were no sales offers which prompted me to lower my liquidating value estimate."

Mr. Schill was requested also to estimate the liquidating value of the land and building one year after the foreclosure sale date. He estimated it at $60,000.

Thomas H. Brennan was the man responsible for the Government's bid in price of $55,969. The method he used to calculate is clear from the transcript:

"Q Would you go through those calculations you make, the end result of which is the bid which Mr. Owens made?

*  *  *  *  *  *

A I got the figure from the appraiser [Mr. Schill] based on what the property would be worth at the end of the redemption period one year hence from the date of sale.

Q What was that figure?

A $60,000.

Q Then what did you do?

A I looked at the tax records and I looked also—we had a title re-

port. As best I could determine there were no junior liens on the property, no senior liens on the property; junior liens I believe there were some but it didn't affect us because we would foreclose them out. I looked at the previous years tax record. The year's taxes would accrue during the period of redemption. The figure for 1963, I estimated being around $431. Knowing the cost of resale of the property would average approximately 6 per cent, which is the going rate for brokers, I took 6 per cent of the value which amounted to $3600 and I reached a total then of $4031, which I deducted from the $60,000 and reached a protective bidding figure of $55,969.

Q  Why is it again you were concerned with these expenses which would be incurred a year following the foreclosure sale?

A  The property, if it were not redeemed as was the instance of many of our properties at that time, would be worth this $60,000 in the future. The taxes would accrue and would have to be paid. The cost of resale to the property would have to be paid by the Government in order to move it. So as a consequence I was trying to determine at what price we could borrow or bid in the property and get the market value out of it, the equivalent of the market value."

If the corporation contended in good faith that the foreclosure sale of the real property was invalid, its remedy was to file a timely suit to set it aside. The evidence does not reveal that any such suit was ever filed. Furthermore, defendants had opportunity to bid on the property at the Sheriff's sale, but submitted no bid.

The evidence adequately supports the trial judge's conclusion that the defendants' appraisers failed to take into ac-

count the loss of the dealership franchise and the depressing effect which a forced sale would have on the value of the property.

In our opinion, the findings of fact of the District Judge that the price bid in by SBA was, under the circumstances, fair, were supported by substantial evidence and are not clearly erroneous.

The judgment of the District Court is affirmed except as to appellant, Orville Leslie, as to whom it is vacated because, on account of his death, he was not served with summons.