**UNITED STATES of America,
Plaintiff, Appellant,**

v.

**HUGHES HOUSE NURSING HOME,
INC., et al., Defendants, Appellees.**

**No. 82–1717.**

United States Court of Appeals,
First Circuit.

Argued April 5, 1983.
Decided July 1, 1983.

Patti B. Saris, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for plaintiff, appellant.

Usher A. Moren, Cambridge, Mass., with whom David Berman, and Berman & Moren, Cambridge, Mass., were on brief, for defendants, appellees.

Before CAMPBELL, Chief Judge, HAYNSWORTH,* Senior Circuit Judge, and BREYER, Circuit Judge.

BREYER, Circuit Judge.

On December 5, 1979, the United States sued the Hughes House Nursing Home, Inc. and Walter Hughes to recover Medicare overpayments that Blue Cross made to the Home from 1967 to 1971. The applicable statute of limitations (insofar as relevant here) provides that this action

> shall be barred unless the complaint is filed within six years after the right of action accrues . . . .

28 U.S.C. § 2415(a). The district court held that the government's "right of action accrue[d]" before December 5, 1973 (six years before the complaint was filed) and it dismissed the action. The government appeals. After examining the positions taken by district courts and some circuit courts of appeals on the question of accrual date, we conclude that, for most of the payments here at issue, the statute of limitations began to run when the administrative body made the "final retroactive adjustment" to the Nursing Home's account. *Compare United States v. Pisani*, 646 F.2d 83, 89 (3d Cir.1981) (cause of action accrues at time of final audit); *United States v. Withrow*, 593 F.2d 802 (7th Cir.1979) (same); *and United States v. Normandy House Nursing Home, Inc.*, 428 F.Supp. 421 (D.Mass.1977) (same); *with United States v. Gravette Manor Homes, Inc.*, 642 F.2d 231 (8th Cir.1981) (cause of action accrues at time of final adjustment); *United States v. White House Nursing Home, Inc.*, 484 F.Supp. 29 (M.D.Fla.1979) (same); *United States v. Graham*, 471 F.Supp. 123 (S.D.Tex.1979) (same); *and United States v. Gottlieb*, 424 F.Supp. 417 (S.D.Fla.1976) (treating final adjustment and audit as simultaneous); *cf. United States v. Bragg*, 493 F.Supp. 470 (M.D.Fla. 1980) (for payments for medically unnecessary services, cause of action accrues when payment is made). Since that adjustment was made within the relevant six-year period, the government may proceed with its case.

I

The government's cause of action "accrues" and the statute of limitations starts to run when the government (through Blue Cross, the "fiscal intermediary") can legally require the provider to repay the overpayment. *See United States v. One 1961 Red Chevrolet*, 457 F.2d 1353, 1358 (5th Cir.1972); *Mack Trucks, Inc. v. Bendix Westinghouse Automotive Air Brake Co.*, 372 F.2d 18, 20 (3d Cir.), *cert. denied*, 387 U.S. 930, 87 S.Ct. 2053, 18

* Of the Fourth Circuit, sitting by designation.

L.Ed.2d 992 (1967) (a cause of action accrues with the occurrence of the final significant event necessary to make the claim suable). The district court found it helpful to view government and provider as having entered into a "contract." This is a useful analogy; and, in any event, the Medicare statutes, rules and regulations create the basic "contractual terms" that the government claims the provider breached.

Insofar as relevant here, those statutes and regulations provide the following service and payment obligations: The program itself is designed to guarantee health care providers a steady flow of income sufficient to provide service, while ensuring that the government pays no more than the reasonable costs of that service. *See* 42 U.S.C. §§ 1395h(a), 1395x(v)(1)(A); 42 C.F.R. §§ 405.401, 405.402(b)(1)–(2), 405.454(a)–(b). Accordingly, the "fiscal intermediary" (here, Blue Cross) is to make "interim payments" to the providers, at least monthly. 42 U.S.C. § 1395g; 42 C.F.R. § 405.454(b). These interim payments are based upon estimates of the provider's costs. 42 C.F.R. §§ 405.405, 405.454. At the end of each year, the provider is to give the intermediary a statement of its actual costs, 42 C.F.R. § 405.406(b); the intermediary will then make an "initial retroactive adjustment" bringing the money that the provider received in line with its costs as revealed in the statement. 42 C.F.R. § 405.454(f)(2). Subsequently, the intermediary is to audit the cost reports, to determine the actual "reasonable cost" of the services. This audit "constitute[s] the basis" for a *final* "retroactive adjustment." 42 C.F.R. § 405.-1803(b); *see* 42 U.S.C. § 1395x(v)(1)(A)(ii). In addition to this basic scheme of monthly payments, the intermediary may make "accelerated payments" to a provider with cash flow problems, 42 C.F.R. § 405.454(h), and, prior to May 29, 1973, the intermediary could grant interest-free loans to needy providers, 42 C.F.R. § 405.454(g).

For purposes of this appeal, we assume that the Home was overpaid. The issue is when the government's claim to recover the overpayment accrued: (1) at the time the Home received the money initially; (2) at the time the intermediary made the "initial retroactive adjustment"; (3) when the intermediary made the final audit; or (4) when the intermediary made the "final retroactive adjustment" on the basis of the audit.

The district court chose the first of these times; it chose the date when the Home first received the money. In keeping with the "contract" theory, it analogized the situation to one party to a contract overpaying another by mistake. In such circumstances, the statute of limitations typically begins to run "upon the receipt of payment without regard to when the mistake is discovered." *City of New Bedford v. Lloyd Investment Associates, Inc.,* 292 N.E.2d 688, 692 (Mass.1973).

While the district court's analogy is tempting, we do not believe it consistent with the rules and regulations that determine the parties' obligation. Rather, those regulations suggest that nearly all of the claims set forth in the government's complaint did not accrue prior to the final audit.

For one thing, the regulations indicate that no "mistake" was involved. The initial interim payments to providers typically depart from actual costs, not through "mistake," but because the Medicare program's administrators consciously have determined that estimated payments should be placed directly in the hands of the providers quickly (so that they have funds with which to operate) even though so doing concededly will lead to "underpayments" or "overpayments" throughout the year.

Moreover, the Department of Health and Human Services has developed a specific payment adjustment procedure that entitles the provider (or the intermediary) to keep any overpayment (or underpayment) until a specified cost statement is filed, or a final audit takes place, or a final "adjustment" is made. Here, the "initial retroactive adjustment" created no liability to the government because that adjustment is determined by taking at face value the provider's cost data statements. The government's

claims here are not based upon discrepancies between the provider's statement and the interim payments; rather, for the most part, they rest upon the later audit that allegedly revealed, among other things, that the Home had claimed excessive costs and that it owed Blue Cross "excess accelerated depreciation," *see* 42 C.F.R. § 405.415(d)(3). The government can require the provider to repay any "initial adjustment" overpayment at once, but the provider remains subject to further liability for any additional discrepancy revealed by the audit, *see United States v. Gottlieb,* 424 F.Supp. at 420, and it is this further discrepancy that is here at issue. With a single exception, discussed in Part II, no statute, rule or regulation gives the government any right to collect any additional overpayment of the sort described above before a final audit, formally determining its existence, takes place. *Cf. Crown Coat Front Co. v. United States,* 386 U.S. 503, 515, 87 S.Ct. 1177, 1184, 18 L.Ed.2d 256 (1967) (cause of action under disputes clause in a government contract accrues upon completion of administrative proceedings required by the contract). Whether or not Blue Cross suspects, believes, or even knows that, for example, the Nursing Home's claimed costs are inflated, under existing regulations it has no definite claim to recover the overpayment before the audit.

Further, to look to the regulatory scheme to decide when the fiscal intermediary can require the Home to repay does not give the government undue power to control the timing of a lawsuit. The government has no direct incentive to delay the audit, the "final adjustment," or any subsequent suit. Ordinarily, any such delay will simply reduce its ultimate chances of recovery. In fact, the government, as a specific antidote to bureaucratic indifference, has granted to a provider who does not receive a final determination within 12 months of filing its cost report the right to obtain a hearing from the Provider Reimbursement Review Board. 42 U.S.C. § 1395*oo*(a); 42 C.F.R. § 405.1835. While this 1973 regulation came too late to help appellees, it minimizes the risk that reliance on the regulations

rather than the date of payment will unfairly delay the cause of action accrual date.

While these considerations make clear that the government's claims did not accrue before the "final audit," we must still decide whether they accrued at that time (unrevealed in the record) or later, when the "final retroactive adjustment" was made (Jan. 29, 1975). Some courts have chosen to rely on the date of the audit, *United States v. Pisani, supra; United States v. Withrow, supra; United States v. Normandy House Nursing Home, Inc., supra,* while others have chosen the date of the final adjustment. *United States v. Gravette Manor Homes, Inc., supra; United States v. White House Nursing Home, Inc., supra; United States v. Graham, supra.* We agree with the Eighth Circuit in *United States v. Gravette Manor Homes, Inc.,* that the "final adjustment" date governs. As that court pointed out, the audit does not fix liability until "the official of the intermediary who has the authority to approve and certify the yearly audits has done so." *Gravette,* 642 F.2d at 234. Moreover, this certification is not simply a matter of form, for "[s]ignificant changes" may be made between audit and formal certification, "involving either corrections of the amount due for the year in question, or revisions with respect to other years, either prior or subsequent." *Id.* In following *Gravette* on this point, we note that none of the "audit date" cases explicitly focused on the difference between the audit and the final adjustment. Apparently they assume that the dates of these two events virtually coincided, or that the difference was not relevant to the cases before them. Thus, we do not consider them as serious authority to the contrary. To the extent that our present decision is at odds with *United States v. Normandy House Nursing Home, Inc.,* 428 F.Supp. 421 (D.Mass.1977), that case is disapproved.

■ In sum, the government's cause of action accrued when, under its regulations, it became entitled to demand its money back from the Home. And, those regulations indicate that it became entitled to

demand most of the money once the "final adjustment" was made.

## II

 We note one exception to our "final adjustment" conclusion. One of the items which the government seeks to recover is a "current financing payment"—a form of loan that the government no longer provided to anyone after May 29, 1973. This payment is described in 42 C.F.R. § 405.-454(g), which states:

> Any current financing payments outstanding on May 29, 1973, constitute over payments which are due and payable to the Social Security Administration as of such date.

The words "due and payable," present only in respect to this type of payment, indicate that the government could have demanded repayment of the amount of the current financing payment in May, 1973, over six years before the December, 1979 commencement of the present lawsuit. We believe this language sufficiently definite to indicate that the government's cause of action accrued on May 29, 1973. Hence its claim for recovery of those funds now is barred.

## III

 Appellee Walter Hughes, an individual defendant, to whom the government looks (on a constructive trust theory) for return of the funds, argues that laches bars the government's personal claim against him. A virtually unbroken line of authority, however, holds that a private defendant cannot assert laches against the government. *Guaranty Trust Co. v. United States,* 304 U.S. 126, 132, 58 S.Ct. 785, 788, 82 L.Ed. 1224 (1938) ("The rule *quod nullum tempus occurrit regi* ... appears to be a vestigial survival of the prerogative of the Crown.... [T]he source of its continuing vitality ... [is] public policy ...."); 14 Wright, Miller & Cooper, *Federal Practice & Procedure* § 3652 (1976) (citing numerous cases). *But see Lane v. United States,* 633 F.2d 1384, 225 Ct.Cl. 209 (Ct.Cl.1980) (apparently rejecting prior precedent but without discussion). We see no reason to depart from that long line of authority in this case.

*The judgment of the district court is vacated and the case is remanded for further proceedings consistent with this opinion.*