# Applicability of 21 U.S.C. § 952(a) to the Importation of Morphine Sulfate by the General Services Administration

The provision in 21 U.S C. § 952(a), which prohibits importation of certain controlled substances except in certain specified circumstances, applies to importation by the United States Government.

Notwithstanding the canon of statutory construction that a law should not be read to impose new burdens on the government in derogation of its preexisting rights and privileges, well-established and consistent administrative practice and interpretation of the coverage of 21 U.S.C. § 952(a), as well as its legislative history, indicate that that law covers importations by the United States government.

October 18, 1982

## MEMORANDUM OPINION FOR THE COMMISSIONER, FEDERAL PROPERTY RESOURCES SERVICE, GENERAL SERVICES ADMINISTRATION

This responds to your request for our opinion whether 21 U.S.C. § 952(a) applies to the importation of controlled substances by the United States or its agents. This question has arisen in the context of a proposed importation of morphine sulfate from Turkey, with which your agency has been involved.

Section 952(a) of Title 21, U.S. Code, is a central provision of the Controlled Substances Import and Export Act of 1970 (the Act).[1] The broad terms of § 952(a) provide that it "shall be unlawful" to import into the United States controlled substances except in certain circumstances.[2] On its face, § 952(a) does not exclude the United States from its coverage. On the other hand, it also does not specifically include the United States. Accordingly, in view of the fact that the provision imposes limitations on those whom it covers, and in light of the longstanding canon of statutory construction that statutes imposing burdens should not lightly be read to deny governments preexisting rights or privileges,[3] a

---

[1] Title III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 is entitled the Controlled Substances Import and Export Act of 1970. As its name indicates, Title III places a number of restrictions on the import into and export from the United States of controlled substances See Pub. L. No. 91–513, Title III, 91st Cong., 2d Sess , 84 Stat. 1285, 21 U S C. §§ 951–966

[2] The language of 21 U.S C § 952(a) is quoted in its entirety in part II infra

[3] This canon of statutory construction is stated in a number of judicial opinions. See, e.g., Hancock v Train, 426 U S. 167, 179 (1976); United States v. Wittek, 337 U S. 346 (1949); United States v. United Mine Workers of America, 330 U S. 258, 272–73 (1947); United States v Herron. 87 U.S. (20 Wall ) 251 (1874); United States v. Knight, 39 U.S. (14 Pet ) 301 (1840)

question arises whether the statute does in fact cover importations by the United States, such as that proposed in this case.

We have concluded that, despite the canon of construction referred to in the previous paragraph, the statute and pertinent legislative materials do demonstrate Congress' intention that the law's limitations apply broadly. This intention would not be consistent with implying a general exception for actions by the United States or its agents. This view is strongly buttressed by the fact, discussed below, that the federal agency most directly responsible for enforcing the Act—the Drug Enforcement Administration (DEA)—consistently has taken the position that the statute does reach actions by the United States. In such circumstances, we find no adequate justification in the canon of interpretation—a device for use in doubtful cases—for concluding that 21 U.S.C. § 952(a) does not apply to actions by the United States. In practical terms, this means that the importation by the United States of controlled substances referred to in § 952(a) is prohibited unless one of the exceptions in § 952(a) is found to pertain.

## I. Background Facts

Your opinion request follows an earlier opinion of this Office, dated July 19, 1982, which also dealt with the proposed importation of morphine sulfate from Turkey.[4] In that opinion, we assumed *arguendo* that § 952(a)'s proscription on the importation of controlled substances, except in certain circumstances, does cover actions by the United States.[5] Passing that issue, we noted that further attention might profitably be paid to the exceptions themselves, viewed in light of the particular facts concerning the proposed importation of morphine sulfate.

Specifically, we suggested that the involved agencies should ascertain whether the "emergency" exception in 21 U.S.C. § 952(a)(2)(A) could apply to the proposed importation of morphine sulfate for purposes of replenishing the National Defense Stockpile's supply of such substances. We noted that we were not aware of whether the facts would establish the basis for invoking such an exception. Nevertheless, we sought to identify the appropriate lines of inquiry.[6] Having done so, we indicated that if the facts would not support the use of the emergency exception, we would be glad to address the underlying legal question regarding 21 U.S.C. § 952(a)'s applicability to the United States.

---

[4] *See* Memorandum for Francis M. Mullen, Jr., Acting Administrator, Drug Enforcement Administration, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, entitled "Importation of Morphine Sulfate from Turkey" (July 19, 1982). [NOTE: The July 19, 1982 opinion is reprinted in this volume at p. 455, *supra*. Ed.]

[5] We noted in the July 19, 1982 opinion not only that an argument could be made that 21 U.S.C. § 952(a) does not apply to the United States, but also that a contrary argument could be advanced. In view of the lack of any sure footing for the contention regarding the nonapplicability of § 952(a) to the United States, we suggested that further attention be paid to the possibility of utilizing the statutory exception for an emergency in present circumstances.

[6] For instance, we noted that, in order to make the requisite finding for using the emergency exception in 21 U S C. § 952(a)(2)(A), it would be "essential first to identify precisely what that need [for morphine sulfate] is, second to determine whether failure to fulfill that need creates an emergency situation, and finally to examine whether domestic supplies are adequate to meet the need as identified. . . ." Memorandum, *supra* note 4, at 4.

## II. Analysis of the Statute

The question before us is one of statutory construction. The pertinent language is as follows:

> It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter, except that—
>
> (1) such amounts of crude opium and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, and
>
> (2) such amounts of any controlled substance in schedule I or II or any narcotic drug in schedule III, IV, or V that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States—
>
> (A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate, or
>
> (B) in any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title,
>
> may be so imported under such regulations as the Attorney General shall prescribe. No crude opium may be so imported for the purpose of manufacturing heroin or smoking opium.[7]

There is no question that morphine sulfate—a refined derivative, or salt, of opium—is a schedule II controlled substance within the meaning of § 952(a).[8] It is not "crude opium" for purposes of § 952(a)(1). Accordingly, its importation into the United States in present circumstances is barred unless one of the exceptions in § 952(a)(2) applies, or unless—and this is the issue about which you have sought our opinion—§ 952(a) as a whole does not cover actions of the United States but rather is limited to actions by private, nongovernmental parties.

On the one hand, it may be argued that the broad terms of § 952(a) should not be read to cover actions by the United States in light of the canon of construction

---

[7] 21 U.S C § 952(a)

[8] *See* 21 U S C. § 812(c), 21 C.F.R. § 1308.12. Morphine is the principal alkaloid, or organic base, of opium, which is the coagulated juice of the opium poppy plant, *papaver sommferum*. Morphine in the form of a soluble salt—such as morphine sulfate—is used as an analgesic or a sedative. See Webster's Third New International Dictionary 1471 (1976); 15 Encyclopaedia Britannica 856 (1971)

579

identified at the outset of this opinion. This canon holds that, absent contrary indication in relevant legislative materials, a statute imposing burdens normally should not be read to impose those burdens on the government in derogation of its preexisting rights or privileges.[9]

Historically, this rule originated in the English doctrine that the Crown is presumed to be unaffected by acts of Parliament unless the acts are directed specifically at the Crown.[10] Because in the United States sovereignty always has resided by theory and practice in the people, rather than in a monarch, transplantation of the English rule to this country necessarily has led to its subtle transformation. The rule's chief policy basis in American case law is the notion that Congress is presumed to have intended to preserve on behalf of the people the efficient functioning of government, and therefore a statute generally should not be read to impose new burdens on government without indications that this in fact was Congress' intention.[11] In the present context, this rule of construction could be used as a basis for arguing that § 952(a) was not intended to impose new burdens on the United States, for the provision does not clearly state that it was so intended.

On the other hand, the foregoing canon of construction should not be viewed as an absolute guide to the construction of any statute. One commentator has stated that although the canon has been useful in a number of cases, "[i]t is questionable . . . whether the rule still continues to command the same influence today." 3 C. Sands, Sutherland Statutory Construction § 62.03 (4th ed. 1974). The "rule" that the government normally is to be excluded from coverage of statutes imposing burdens is, in fact, subject to numerous exceptions. It is merely a guide to the most plausible construction of legislative intent when other indications of such intent are not present or dominant. The central inquiry when faced, as we are here, with possible application of the canon of construction is to determine whether there are other specific grounds on which to rest an interpretation of the statute that are more definite and ultimately more helpful than the canon of construction itself.[12]

In present circumstance, one of the most striking features is the existence of a longstanding, consistent, and specific administrative construction of the statute in question on the very point at issue here. In conversations with officials of the Drug Enforcement Administration—which is responsible for administering the statute of which § 952(a) is a central part—we have learned that for years the agency has interpreted § 952(a) as applying not only to importations of con-

---

[9] *See United States* v *United Mine Workers of America.* 330 U S 258, 272–73 (1947). *United States* v *Herron,* 87 U.S. (20 Wall.) 251 (1874). *United States* v. *Knight,* 39 U S. (14 Pet.) 301 (1840)

[10] *See United States* v. *California,* 297 U.S. 175, 186 (1936); *see also* 3 C Sands, Sutherland Statutory Construction § 62 01 (4th ed 1974).

[11] *See Hancock* v *Train,* 426 U S. 167, 169 (1976), *Letter Minerals, Inc* v. *United States,* 352 U S. 220, 224–25 (1957); *United States* v *Wittek,* 337 U S 346 (1949); *Guaranty Trust Co* v. *United States,* 304 U.S. 126, 132–33 (1938).

[12] As the Supreme Court has noted, the canon of construction is merely "an aid to consistent construction of statutes of the enacting sovereign when their purpose is in doubt, but it does not require that the aim of a statute fairly to be inferred be disregarded because not explicitly stated." *United States* v *California,* 297 U.S 175, 186 (1936). *See United States* v *Wittek,* 337 U S 346, 358–59 (1949); 3 C Sands, Sutherland Statutory Construction § 62 02 (4th ed. 1974)

trolled substances by private parties, but also to importations of such substances by the government itself, specifically including federal agencies. Thus, in the course of the routine administration of this statute, the DEA and its predecessor agency[13] have confronted precisely the issue that has been put to us. The federal agencies involved have been required to meet all statutory and regulatory requirements pertaining to importations of controlled substances.[14]

For instance, we have been told that when an agency, such as the National Institute on Drug Abuse of the Department of Health and Human Services, has sought to import quantities of controlled substances for laboratory tests, the agency has been required by the DEA to comply with applicable registration and permit requirements. These requirements, authorized by statute, see 21 U.S.C. §§ 957 & 958, are set forth in the DEA's regulations, see 21 C.F.R. §§ 1311 & 1312 (1981). Among other things, these regulations require importers of controlled substances to obtain an annual registration, unless specifically exempted from the requirement. See 21 C.F.R. § 1311.21. Among those who are exempt from this requirement are officials of the United States Army, Navy, Marine Corps, Air Force, Coast Guard, or Public Health Service, see 21 C.F.R. § 1311.24, and officials of the United States Customs Service, the Food and Drug Administration, and "any other Federal officer who is lawfully engaged in the enforcement of any Federal law relating to controlled substances. . . ." See 21 C.F.R. § 1311.25. By exempting these federal officials, the DEA has plainly indicated its understanding that otherwise, the requirements would have applied to the officials—as they do to officials not exempted. Furthermore, before any person may import a controlled substance, a permit must be issued. See 21 C.F.R. § 1312.11. Specific grounds for the issuance of such permits are set forth in the DEA's regulations. See 21 C.F.R. § 1312.13. These permit requirements, the DEA has told us, also have regularly been applied to federal agencies seeking to import quantities of controlled substances for official purposes.

The existence of such a consistent agency interpretation of its own authorizing legislation is viewed by courts as being of substantial importance. The Supreme Court has underscored that "[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration." Udall v. Tallman, 380 U.S. 1, 16 (1965). The reason for this deference is that agencies have considerable familiarity with the nuances of their authorizing legislation and its application in practice, and may generally be presumed to be expert in its construction. See generally Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 381 (1969); Zemel v. Rusk, 381 U.S. 1, 11–12 (1965). Of course, courts remain ultimate arbiters of the law in contested cases. See, e.g., Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272 (1968). However, courts give

[13] The Drug Enforcement Administration was created by a reorganization plan in 1973 The description in text of DEA's interpretation of § 952(a), enacted in 1970, also applies, we are told, to its predecessor, the Bureau of Narcotics and Dangerous Drugs

[14] Our discussion of the DEA's interpretation of § 952(a) necessarily relies on factual representations made to us by DEA officials

significant weight to a plain and longstanding administrative construction. The Supreme Court has explained that such a construction has the power "to persuade," if not "control," judicial analysis:

> We consider that the rulings, interpretations and opinions of [agencies], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*General Electric Co.* v. *Gilbert,* 429 U.S. 125, 141–2 (1976), quoting *Skidmore* v. *Swift & Co.,* 323 U.S. 134, 140 (1944).

In this case, the DEA's understanding of the coverage of federal agencies by § 952(a) is well-established and consistent. Moreover, it would appear to be the product of informed judgment. Certainly, the DEA has been confronted repeatedly with situations in which it has had to determine how to treat federal agencies under § 952(a). Each time, we are told, it has reached the view that such agencies are subject, as are private parties, to applicable statutory and regulatory requirements. Furthermore, this interpretation, we understand, dates back at least to the time of the passage of § 952(a) in 1970, if not to earlier years when § 952(a)'s immediate predecessor (which was similar in nature) was in effect. In such circumstances, courts would pay even greater attention to the agency's view. *See, e.g., SEC* v. *Sloan,* 436 U.S. 103, 120 (1978); *E.I. DuPont de Nemours & Co.* v. *Train,* 430 U.S. 112, 134–35 (1977); *Union Electric Co.* v. *EPA,* 427 U.S. 246, 256 (1976); *Train* v. *Natural Resources Defense Council,* 421 U.S. 60, 87 (1975); *Hercules, Inc.* v. *EPA,* 598 F.2d 91, 101 (D.C. Cir. 1978).

Our own review of the statute's legislative history tends, at a general level, to confirm the DEA's understanding of § 952(a)'s coverage. First, there are unmistakable indications that Congress intended the importation restriction to operate as a critical element in the statute's scheme of controlling the importation of controlled substances.[15] Furthermore, there are indications that *any* importation of controlled substances by *all* importers—whether or not a private importer that might be suspected of seeking to engage in illicit conduct—was intended to be covered. Thus, the major committee report on the bill containing § 952(a) that was enacted in 1970 stated that the importation restriction refers "to *any* article, *any* bringing in or introduction of such article into any area. . . ." H.R. Rep. No. 1444 (Pt. 1), 91st Cong., 2d Sess. 74 (1970) (emphasis added). In floor debate on the predecessor provision, the Narcotic Drugs Import and Export Act of 1922, Pub. L. No. 227, 67th Cong., 2d Sess., 42 Stat. 596, 21 U.S.C. § 173 (1964), the provision's proponent stated that the predecessor importation restriction was

---

[15] *See* H.R. Rep. No. 1444 (Pt. 1), 91st Cong., 2d Sess. 71–80 (1970). *See also* 116 Cong. Rec. 33317 (1970).

an effort to use "best efforts to control or cause to be controlled *all those who import* or export morphine, cocaine, or their respective salts." 62 Cong. Rec. 6334 (1922) (emphasis added). These references in the legislative history to "any importation" and "all those who import" morphine or a salt of morphine suggest that Congress intended a broad coverage of the importation restriction. It is consistent with this intent to construe § 952(a), as the DEA has done, to cover actions of the United States.

Furthermore, there is some indication in the legislative history that one purpose served by the importation restriction is to prevent drug manufacturers in foreign countries from having access to the domestic American market in finished narcotic drugs. Thus, the relevant Committee report on the 1922 predecessor to § 952(a) stated that the restriction on the importation of finished narcotic drugs (as opposed to raw opium and coca leaves) "will also . . .close the legitimate domestic market to foreign manufacturers." H.R. Rep. No. 852, 67th Cong., 2d Sess. 7–8 (1922).[16] Although the precise reasons for closing the domestic market to foreign manufacturers may not be entirely clear, they may reasonably be understood to include the desire to protect the American drug industry from foreign competition—as well as simply to shut off importation in order to prevent illicit trafficking in drugs. Certainly, domestic drug industry representatives involved in manufacturing finished narcotics have so understood the intent of § 952(a). *See, e.g., Controlled Dangerous Substances, Narcotics and Drug Control Laws: Hearings Before the House Committee on Ways and Means*, 91st Cong., 2d Sess. 458–62 (1970) (testimony of Stephen Ailes on behalf of three American firms licensed in 1970 to import opium for processing for legitimate medical purposes). Moreover, we understand from our conversations with DEA officials that the DEA itself is of the view that one—although not the major—statutory aim served by § 952(a) is the protection of the domestic American drug industry from foreign competition.

We would not want to rest an interpretation of § 952(a) entirely on the few indications of a "protectionist" purpose that we have found in the legislative

---

[16] The full passage in the course of which this comment occurs is the following:

> The existing law in section 1 of the narcotic drugs import and export act [of 1909, as amended by the Harrison Act of 1914] . . . prohibits the importation of smoking opium, but permits the importation for medical purposes of other opium products . . . The United States manufactures more than a sufficient amount of narcotic drugs for domestic medical and scientific uses. The committee therefore believes it desirable to restrict our importation to raw opium and coca leaves, and to admit these only in amounts found by the Secretary of State, the Secretary of the Treasury, and the Secretary of Commerce to be sufficient to provide our manufacturers with enough of the raw products for the domestic and scientific uses of this country, and for foreign exportation as required by the opium convention for medical and scientific uses of legitimate foreign consumers. This restriction will also aid in enforcing our export restrictions. . . . *It will also* aid in preventing evasions of the Harrison Act, by means of the unlawful importation into this country of narcotic drugs previously imported by us and sent into the export trade, and will *close the legitimate domestic market to foreign manufacturers*. By proper action in authorizing the importation of the raw products, it is believed that the three Secretaries can curb any tendency to increase the price of the manufactured narcotic drugs which might otherwise result from the prohibition of their importation, and by such action also take account of increased domestic consumption beyond the ordinary needs for medical and scientific uses, due either to diversion of drugs into illegitimate domestic channels .. or to epidemic or war conditions. (Emphasis added.)

H.R. Rep. No. 852, 67th Cong., 2d Sess. 7–8 (1922).

history. However, we must acknowledge that, however ambiguous they may appear to be, such indications do exist, and they directly support the notion that § 952(a) should be interpreted to apply to the United States, as well as to private parties.[17]

In sum, in view of the longstanding and consistent agency interpretation of § 952(a) and its predecessor as applying to importations of controlled substances by private parties and federal agencies, in view of suggestions in the legislative history that Congress intended a broad construction of § 952(a) in order to fulfill its purposes, and in view of the absence of any indication in the legislative history to the contrary, we conclude that § 952(a) should be understood to apply to importations by the United States. It thus applies to the proposed importation of morphine sulfate from Turkey that is presently the subject of negotiations involving the General Services Administration.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[17] An argument can be made that Congress did not intend to cover the United States in § 952(a), for it provided for a means of enforcing § 952(a), namely, by possible criminal penalty, *see* 21 U.S C § 960, that is not appropriately applied against the United States. The problem with this argument is that it ignores that the criminal enforcement provisions are not exclusive 21 U.S C § 964 states that any penalty imposed for violation of the import and export restrictions "shall be in addition to, and not in lieu of, any civil or administrative penalty or sanction authorized by law." It is not inconceivable that an aggrieved private party may be able to achieve judicial review of an importation of a controlled substance by the United States, and seek in a judicial proceeding a civil remedy predicated on an alleged violation of § 952(a). Accordingly, we cannot give definitive weight to the existence of criminal enforcement provisions in the statute To us, the central question is what Congress' intent in imposing the importation restriction itself appears to have been That question is best resolved by referring to § 952(a)'s own legislative history and, in this case, the longstanding agency construction of the provision.